---

**CONCURRENCE**

---

SILER, Circuit Judge, concurring. Although I concur in the resolution of this case, I write separately because I do not think that we need to adopt the "treating physician rule" in this case. I would be inclined to adopt the decision of the Eighth Circuit in *Conley v. Pitney Bowes,* 176 F.3d 1044 (8th Cir. 1999), when it held that the "treating physician's opinion [does not trump] all other evidence but that a court must give it appropriate weight." *Id.* at 1049. However, I think that Fortis acted arbitrarily and capriciously under all the circumstances in denying benefits to Darland, even without giving any special deference to the opinions of the treating physicians.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0025P (6th Cir.)
File Name: 03a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CAROLLTON B. DARLAND,
    *Plaintiff-Appellant,*

    *v.*

FORTIS BENEFITS INSURANCE
COMPANY,
    *Defendant-Appellee.*

No. 01-5387

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00432—Jennifer B. Coffman, District Judge.

Argued: July 31, 2002

Decided and Filed: January 22, 2003

Before: SILER, COLE, and CLAY, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Lee E. Sitlinger, SITLINGER, MCGLINCY, STEINER, THEILER & KAREM, Louisville, Kentucky, for Appellant. Angela Logan Edwards, WOODWARD, HOBSON & FULTON, Louisville, Kentucky, for Appellee. **ON BRIEF:** Lee E. Sitlinger, SITLINGER, MCGLINCY, STEINER, THEILER & KAREM, Louisville, Kentucky, for

Appellant.  Angela Logan Edwards, Patrick W. Michael, WOODWARD, HOBSON & FULTON, Louisville, Kentucky, for Appellee.

CLAY, J., delivered the opinion of the court, in which COLE, J., joined.  SILER, J. (p. 32), delivered a separate concurring opinion.

———————————

## OPINION

———————————

CLAY, Circuit Judge.  Plaintiff, Carollton B. Darland ("Darland"), appeals from the district court's judgment granting Defendant, Fortis Benefits Insurance Company's ("Fortis"), motion for affirmation of its decision denying continued long term-disability ("LTD") benefits for Darland; granting summary judgment on Fortis' counterclaim against Darland for reimbursement of an overpayment of LTD benefits; and denying Darland's motion for summary judgment seeking to recover LTD benefits and dismissing his claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.  Specifically, the district court concluded that Fortis did not abuse its discretion in determining that Darland's LTD benefits under its policy were limited to a period of twenty-four months, finding that Darland's disabling condition did not prevent him from performing all the material duties of his job so as to qualify for continued LTD benefits.  For the reasons set forth below, we **AFFIRM** the district court's order granting Fortis' counterclaim for reimbursement, **REVERSE** that portion of the district court's order affirming Fortis' denial of continued LTD benefits to Darland and denying summary judgment to Darland for the same, and **REMAND** this case to the district court for further proceedings consistent with this opinion.

a financial stake in the matter as the insurer who ultimately pays the benefits.  Although we do not dispute the concurrence's assertion that the treating physician's opinion does not "trump" all other evidence, we do maintain that the treating physician's opinion is entitled to deference particularly when, as in the matter at hand, there is an absence of substantial evidence to the contrary.

In fact, because there is such substantial evidence on this record to support Darland's claim, we would hold in the alternative that Darland would be entitled to prevail on an abuse of discretion standard even without the invocation of the treating physician rule.  Accordingly, we find that the district court abused its discretion in denying Darland's motion for summary judgment on his claim for continued LTD benefits and affirming Fortis' motion for affirmation of its denial of the same because Fortis' decision denying Darland's claim for continued LTD benefits was arbitrary and capricious.

## CONCLUSION

Based upon the foregoing reasons, the district court erred in granting Fortis' motion for affirmation of its decision denying continued LTD benefits to Darland; denying Darland's motion for summary judgment for the same; and dismissing his ERISA claim.  However, because Darland does not challenge the order granting Fortis' counterclaim for reimbursement of an overpayment of insurance benefits, Fortis is entitled to summary judgment on its counterclaim. Accordingly, we **AFFIRM** the district court's order granting summary judgment to Fortis on its counterclaim, **REVERSE** that portion of the order affirming Fortis' denial of continued LTD benefits and denying Darland's summary judgment motion for the same, and **REMAND** with instructions to the district court to order Fortis to continue the payment of LTD benefits to Darland, and to award him all benefits past due plus interest and costs.

is a similarly common sense requirement that, while inconsistent with the exercise of absolute discretion, is perfectly consistent with the plan administrator's role in properly determining whether a particular claimant is disabled.

*Id*. at 1143-44 (footnote omitted). Although courts that have declined to apply the treating physician rule in an ERISA context contend that there is a potential conflict of interest because a treating physician stands to profit if benefits are not terminated, *Regula* notes that "[u]nlike health benefits, disability insurance benefits serve as a salary replacement payable to the employee" and that "any potential conflict of interest in ERISA disability cases is no different from that which may exist in the Social Security context." *Id.* at 1143.

Applying the treating physician rule in this case, the district court should have deferred to the opinions of Darland's treating physicians absent substantial evidence in the record contradicting those opinions. Here, there was medical evidence conclusively showing that Darland could not perform all the material duties of his job as an executive vice president of Market Finders. Although Fortis' second peer review panel concluded that Darland could perform all the material duties of his position, the views of these non-treating and non-examining medical consultants hired by Fortis were unduly speculative, as there was nothing in the record to indicate that Darland could stand or sit for prolonged periods of time. Quite to the contrary, the medical opinions of the physicians who actually examined or treated Darland substantiated his disability under the terms of the Fortis policy.

The treating physician rule has particular applicability to the factual circumstances of this case where there is such a stark dichotomy between the opinions of the treating physicians who possessed an abundance of first-hand knowledge of the patient's medical condition and those of the non-treating medical consultants who were hired by a company selected by Fortis, the plan administrator, which had

## BACKGROUND

### A.   Procedural History

This action arises from Darland's claim that he was entitled to recover continued LTD benefits, pursuant to an employee welfare benefit plan, maintained by his employer, Market Finders Insurance Corporation ("Market Finders"). While employed by Market Finders, Darland elected to participate in its employee welfare benefit plan, which is governed by ERISA, and the LTD policy available as part of the plan. Fortis, as the plan administrator/disability insurance carrier for Market Finders, provides the plan's LTD benefits.[1] Darland claims that he is totally and permanently disabled due to degenerative disc disease and osteoarthritis in his back. From October 17, 1996 through August 16, 1998, Fortis paid Darland monthly disability benefits. However, the LTD policy contained a "Special Conditions" provision limiting the payment of LTD benefits to a maximum period of twenty-four months for certain disabling conditions. While Fortis eventually conceded that Darland was exempt from the Special Conditions provision of the policy because his disabling condition resulted from arthritis, it denied Darland's claim for continued disability benefits on the ground that he failed to satisfy the "Occupation Test" as defined in the policy because his disability did not prevent him from performing the "material duties of his regular occupation." Consequently, Darland filed a complaint in Jefferson Circuit Court in Kentucky on June 10, 1999, including a claim for benefits under ERISA. Fortis timely removed the action to federal court. After the parties exchanged initial disclosures, Fortis filed its motion for affirmation and for summary judgment. Darland countered with his own motion for summary judgment. On March 13, 2001, the district court entered a memorandum opinion and order granting Fortis' motion for affirmation and summary judgment and denying Darland's

---

[1] According to Darland, Market Finders merely purchased an insurance policy from Fortis, such that any benefits are paid from Fortis' funds in accordance with its insurance policy.

cross-motion for summary judgment. On the same date, the district court entered a judgment in favor of Fortis, dismissing Darland's case with prejudice and assessing costs against him. From this judgment, Darland filed a timely appeal on June 10, 1999. Thereafter, in an order of clarification issued on July 27, 2001, the district court stated that its March 13, 2001 memorandum opinion and order also granted summary judgment in favor of Fortis on its counterclaim for reimbursement of an overpayment of insurance benefits and that the total award on its counterclaim is $14,306.22.

## B. Substantive History

Darland, an employee of Market Finders since 1979, was an executive vice-president of the company at the time of his disability. The job description for Darland states as follows:

Responsibilities for this position include the following:

Overseeing all activities of the transportation department, the aviation department, the claims department, all underwriting departments, and the branch offices located in Dayton, Ohio; Pittsburgh, Pa; Greenville, S.C., Houston, Tx; and St. Petersburg, Fl. This encompasses developing and monitoring markets and business that relate to insuring the success and profitability of all divisions and departments.

Selection and training of staff to fill various duties within the transportation division, claims department, policy typing department and all branch operations.

Develop objectives, plan and execute incentives; conduct monthly meetings with the different departments, and travel to branch offices for same.

Supervise and direct growth and expansion of transportation division.

Advise, review and regulate all claims business.

"considerable doubt about holding the rule applicable in ERISA cases").

In our view, the treating physician rule should apply in ERISA cases, requiring courts to defer to the opinions of a claimant's treating physicians unless there is substantial evidence contradicting them. As the Ninth Circuit pointed out in *Regula,*

The treating physician rule applied in the Social Security setting requires that the administrative law judge ("ALJ") determining the claimant's eligibility for benefits give deference to the opinions of the claimant's treating physician, because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." This grant of deference to a treating physician's opinions increases the accuracy of disability determinations, by forcing the ALJ who rejects those opinions to come forward with specific reasons for his decision, based on substantial evidence in the record. Just as in the Social Security context, the disputed issue in ERISA disability determinations concerns whether the facts of the beneficiary's case entitle him to benefits. Therefore, for reasons having to do with common sense as well as consistency in our review of disability determinations where benefits are protected by federal law, we see no reason why the treating physician rule should not be used under ERISA in order to test the reasonableness of the administrator's positions.

*Regula,* 266 F.3d at 1139. As the Ninth Circuit further noted:

Whereas differences exist between ERISA and Social Security in the discretion afforded plan administrators and ALJs in interpreting the terms of benefits coverage, we are not convinced that their roles differ significantly when it comes to deciding whether the facts of a particular case fall within clearly established definitions of what constitutes a disability. As in the Social Security disability context, a rule requiring plan administrators to give special weight to the opinions of treating physicians

the claimant's eligibility for benefits. *See, e.g., Regula*, 266 F.3d at 1139; *see also Peabody Coal Co. v. Groves*, 277 F.3d 829, 833-35 (6th Cir. 2002) (applying the "treating physician presumption" in a Black Lungs Benefit case holding that an ALJ may place greater weight on the opinion of a claimant's treating physician than those of non-treating physicians).

Several circuits have adopted the treating physician rule in an ERISA context. *Regula,* 266 F.3d at 1139 (holding as a matter of first impression that the treating physician rule is applicable in the context of a disability benefits determination under ERISA); *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996) ("We have held, in Social Security cases, that a reviewing physician's opinion is generally accorded less deference than that of a treating physician . . . and we apply this rule in disability cases under ERISA as well."); *but see Conley v. Pitney Bowes*, 176 F.3d 1044, 1049 (8th Cir. 1999) (noting that "the rule is not that a treating physician's opinion trumps all other evidence but that a court must give it appropriate weight"). On the other hand, several circuits have declined to apply the treating physician rule in an ERISA context. *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 n.4 (2d Cir. 2001) (finding that "the 'treating physician rule' serves no particular purpose in the context of *de novo* review" of an ERISA administrator's decision); *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989) (noting that "the Social Security law that greater weight must be given to the opinion of the treating physician is not applicable to the decision of the claims administrator of an ERISA-governed employee health plan where the treating physician has an economic interest in the matter"). In addition, several circuit courts have questioned, without deciding, whether the rule should be applicable in an ERISA context. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607-08 (4th Cir. 1999) (noting that the treating physician rule would only be applicable when "an award of benefits [is] based upon a treating doctor's opinion of disability absent persuasive contradictory evidence"); *Salley v E.I. Dupont de Nemours & Co.*, 966 F.2d 1011, 1016 (5th Cir. 1992) (expressing

Convey corporate policy to all departments and branch offices.

Attend and participate in industry related meetings and conventions. This involves substantial travel, both by auto and air. *Meetings, seminars and conventions involve long hours of standing*, and attending continuous individual appointments during annual conventions.

Track losses and loss development to properly assess underwriting guidelines. Construct lengthy report charts and figures.

*Considerable telephone contact with industry and agency personnel. This requires many hours of remaining seated*.

As Executive Vice-President of an ever-growing company, the responsibilities increase daily. This job also requires knowledge of labor laws, conducting performance interviews, and maintaining a rigorous schedule on a daily basis.

(J.A. at 526 (emphasis added).)

Darland complained of chronic back problems for many years. On February 15, 1996, he was treated by Dr. Raymond Shea, an orthopedic surgeon in Louisville, Kentucky. Since then, Darland has continued under Dr. Shea's care. On his initial visit, Dr. Shea obtained X-rays, which revealed degenerative disc disease in Darland's low back at levels "L5/S1 and at L3-4 and L4-5." (J.A. at 700.) Upon Dr. Shea's advice, Darland underwent epidural injections by Dr. Elmer Dunbar at Columbia Audubon Hospital in Louisville, Kentucky on February 21, 1996, February 29, 1996 and March 7, 1996. During this time, Darland was unable to work for approximately one month, although he attempted to return to work, despite Dr. Shea's observation that his prognosis was poor.

Darland continued to be seen by Dr. Shea on March 18, 1996, April 15, 1996 and July 17, 1996, and was referred to a neurological surgeon, Dr. John Guarnaschelli of Louisville Imaging Services, for a second opinion. After obtaining a Magnetic Resonance Imaging ("MRI") of Darland's lumbar spine, Dr. David A. Petruska of Louisville Imaging Services met with him on August 9, 1996 to report that based upon the results of his MRI scan, there was "evidence of multilevel lumbar degenerative disc disease," thus confirming Dr. Shea's diagnosis regarding Darland's low back problems. (J.A. at 127.)

After July 15, 1996, Darland was not able to return to work at Market Finders because of his continued low back problems. Following Dr. Shea's recommendation, Darland applied for LTD benefits on September 18, 1996, claiming that he was disabled due to degenerative disc disease. In support of Darland's claim, Dr. Shea completed and submitted to Fortis an Attending Physician's Statement. According to Dr. Shea's records, Darland's back problem extended throughout his spine and caused him severe pain, stiffness and limited movement of his neck and back. Darland also suffered from dizziness and drowsiness from taking many powerful medications. Thus, according to Dr. Shea, Darland could not perform in his position as an executive vice-president due to his physical limitations and to his inability to think and concentrate as a result of the physical pain and the effect of his medications.

From October 17, 1996 through August 16, 1998, Fortis, as the disability insurance carrier for Market Finders, paid Darland monthly disability benefits in the amount of $3,473.00. While Fortis was paying the monthly LTD benefits to Darland, it also continued to gather information about Darland to assess his medical condition and his eligibility for continued LTD benefits based upon the policy. At Fortis' request, Darland appeared for an independent medical evaluation performed by Dr. Ellen Ballard of Rehabilitation Associates, P.S.C. of Louisville, Kentucky in

laying [sic] down" demonstrated that he could perform his job as an executive. However, as determined by Dr. Shea and Dr. Ballard, Darland is not capable of sitting for prolonged periods of time, thus indicating that he cannot perform even the sedentary function of his job. Moreover, the "functional capabilities evaluation" requested by Fortis indicated that Darland could not stand for a prolonged duration. Nonetheless, Fortis argues that Darland was capable of performing his job based upon the fact that there was virtually no change between the 1991 and 1996 MRI results. However, as Darland points out, the radiologist interpreting the 1996 MRI results noted that his underlying condition had not improved, which was consistent with Dr. Shea's opinion that his condition would not improve, but progressively worsen.

Finally, Fortis relies upon its two peer review panel reports in support of its claim that Darland can perform all the material duties of his job as an executive vice president. However, none of the medical consultants who were selected by Network Medical Review to sit on the panels ever saw or evaluated Darland in determining whether he could perform his job. Further, the conclusions of the peer review panelists were clearly contradicted by the opinions of the physicians who actually examined and evaluated him. Thus, the issue becomes whether the opinions of Darland's treating physicians should be entitled to greater weight than those of the medical consultants hired by Fortis to review Darland's medical records.

At the outset, we note this Circuit has yet to decide whether the "treating physician rule" applies in ERISA cases, although several district courts in this Circuit have ruled that the rule is inapplicable in an ERISA context. *See, e.g., Needham v. Cigna Group Ins.*, No. 1:00-CV-76, 2001 WL 765902 (W.D. Mich., June 22, 2001); *Campbell v. Fortis Benefits Ins. Co.*, 116 F. Supp. 2d 937, 950-51 (M.D. Tenn. 2000). As other circuits have recognized, the treating physician rule is a standard that was developed in the Social Security context requiring the administrative law judge to give deference to the opinions of a claimant's treating physician when determining

Security disability benefits, yet avail itself of that Social Security determination regarding disability to contend, at the same time, that he is not disabled. *Ladd*, 148 F.3d at 753. Though not directly applicable in this case, the principles of judicial estoppel certainly weigh against Fortis taking such inconsistent positions.

In any case, contrary to Fortis' contention, the record did not show that Darland was capable of performing all the material duties of his own occupation. Although Fortis claims that based upon the results of its first peer review panel, Darland was playing golf as late as 1996, Darland points out that this factual assertion was simply incorrect, resting upon a chart entry on April 15, 1996 entered on Dr. Shea's office records, which stated: "Has continued pain and stiffness in the back. Stay on Cataflam and Restoril. Return in two months. He will play golf. s/d." (J.A. at 421.) According to Darland, he was never able to play golf, and the peer review panel would have found that out if it had contacted Dr. Shea. Further, Darland contends that the chart entry was not made by Dr. Shea, but rather by an office employee. In any case, the chart entry was inconsistent with Dr. Shea's office chart in its totality and the rest of Darland's medical records.

Fortis also contends that Dr. Ballard's evaluation supported its position that Darland was capable of performing his job, yet the record indicates that Dr. Ballard agreed with Dr. Shea that Darland was disabled and that his "condition is one that would be aggravated by prolonged sitting and standing." (J.A. at 374-75.) As set forth in Darland's job description, his position as an executive vice president involved "long hours of standing" and "many hours of sitting." (J.A. at 526.) Moreover, given that Fortis continued to pay disability benefits to Darland after Dr. Ballard's evaluation, it is clear that Fortis itself determined that he was not capable of performing all the material duties of his job.

Fortis claims that the evidence that Darland was spending his days "reading books, walking, watching television and

February of 1997. In her evaluation, Dr. Ballard states in part:

> At the present time, I feel that the patient has had appropriate treatment to date and *I do feel that Mr. Darland's current condition is one that would be aggravated by prolonged sitting and standing*. I do think that it is somewhat unusual that Mr. Darland has the amount of difficulty he does given that he is an executive and people with similar conditions often do not have difficulty continuing to be employed. . . .
>
> I feel that it is possible that he might benefit from a pain program, but it is obvious from some of his questions that there is a possible issue of motivation in terms of his return to work. He has not been maintaining contact with his company and it would appear that he has accepted his disability and does not feel that he can return to work. *Therefore, the prognosis for this patient's condition overall improving is somewhat poor*. He might benefit from evaluation at a pain treatment center.

(J.A. at 374-75 (emphasis added).)

Thereafter, on July 8, 1997, Fortis sent a letter to Darland informing him that his disabling condition was subject to a policy limitation that restricted disability benefits to a period of twenty-four months. The "Special Conditions" provision of the policy limiting the payment of LTD benefits to a maximum period of twenty-four months for certain disabling conditions provides as follows:

Special Conditions

We pay only a limited benefit for periods of disability for special conditions. The Maximum Benefit Period for all such periods of disability is 24 months. This is not a separate maximum for each such condition, or for each period of disability, but a combined maximum for all periods of disability and for all of these conditions.

(J.A. at 88.)  The LTD policy defines "special conditions," in relevant part, as follows:

*Special Conditions* means:

● musculoskeletal and connective tissue disorders of the neck and back including any disease or disorder of the cervical thoracic and lumbosacral back and its surrounding soft tissue including sprains and strains of joints and adjacent muscles, except

● arthritis; . . .

(J.A. at 72.)  By a letter dated August 14, 1997, Darland challenged Fortis' attempt to limit his payment of future disability benefits, claiming that the Special Conditions provision did not appear in his copy of Fortis' policy and that Dr. Shea's diagnosis indicated that he suffered from an arthritic condition   that avoided the Special Conditions provision.  In support, Darland provided Fortis with a copy of Dr. Shea's letter dated August 6, 1997, noting that Darland "has been treated for arthritis for many years and this has been the cause of his permanent medical impairment." (J.A. at 329.)

Thereafter, Fortis began to examine whether Darland's claim for arthritis exempted him from the Special Conditions provision of the policy so as to entitle him to LTD benefits beyond the twenty-four month period.  Specifically, Fortis' Clinical Service Department reviewed Darland's file to evaluate his claim that arthritis caused his alleged disability. In a report on October 9, 1997, Fortis' Clinical Service Department states:

While degenerative disease of the spine can involve the apophyseal joint, intervertebral discs, and/or paraspinous ligaments, the term osteoarthritis of the spine should be reserved for degeneration of the apophyseal joints (true diathrodial joints)

Ladd's disability, the defendants encouraged and supported her effort to demonstrate total disability to the Social Security Administration, going so far as to provide her with legal representation.  To further lighten that cost, it then turned around and denied that Ladd was totally disabled, even though her condition had meanwhile deteriorated.  In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory.  This sequence casts additional doubt on the adequacy of their evaluation of Ladd's claim, even if it does not provide an independent basis for rejecting that evaluation.

*Id.* at 756 (citations omitted).

It is equally inconsistent in the present case for Fortis to ignore the Social Security Administration's determination that Darland is disabled.  As in *Ladd*, Fortis requested that Darland apply for Social Security disability benefits so as to reduce the amount of monthly disability payments that it paid Darland under the plan.  Although Fortis claims that the statutory criteria and factors considered by the Social Security Administration may be markedly different from the criteria and factors considered by an insurer in determining whether a claimant is disabled, it is plainly evident that the Social Security standard for a disability determination is much more stringent than that required by Fortis' insurance policy.[3] Moreover, after the Social Security Administration determined on July 8, 1998 that Darland was totally disabled as of July 15, 1996, Fortis then requested that Darland reimburse it for overpayment of insurance benefits, even though Fortis terminated payment of disability benefits to him under its policy on August 16, 1998. As in *Ladd*, it is totally inconsistent for Fortis to request that Darland apply for Social

---

[3]42 U.S.C. § 416 defines "disability" to mean: "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve (12) months. . . ."

We note that a plan administrator's decision denying disability benefits where the Social Security Administration has determined that the applicant was totally disabled has been found to be arbitrary and capricious. For example, in *Ladd v. ITE Corp.*, 148 F.3d 753, 755-56 (7th Cir. 1998), the Seventh Circuit held that the plan administrator's denial of disability benefits was arbitrary and capricious where none of the physicians who examined the plaintiff found that she was capable of working; the insurance company encouraged and assisted the plaintiff in applying for Social Security disability benefits, which were granted after an administrative law judge found that the plaintiff was totally disabled; and the plaintiff's condition was worse when the plan administrator denied her benefits under the plan than when she was granted Social Security benefits. In that case, after the plaintiff was awarded Social Security disability benefits, she was referred by MetLife to a doctor who worked for Network Medical Review Company, the same company employed by Fortis in this case. Without examining the plaintiff, the doctor for Network Medical Review concluded "in a perfunctory report that Ladd had sufficient 'residual functional capacities' to work a full eight-hour day at a sedentary job." *Id*. at 755. On appeal, the Seventh Circuit found that "[t]he grant of social security benefits" had "additional significance:"

It brings the case within the penumbra of the doctrine of judicial estoppel--that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory. The doctrine is technically not applicable here, because MetLife and ITT, the defendants in this suit, were not parties to the proceeding before the Social Security Administration. Yet they "prevailed" there in a practical sense because the grant of social security benefits to Ladd reduced the amount of her claim against the employee welfare plan. If we reflect on the purpose of the doctrine, which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of

A diagnosis of spinal arthritis is equivocal at best. There is no radiographic evidence to support it as a primary diagnosis (no indication of osteophytic spurring) sclerosis, changes in the bony contours or degeneration of the apophyseal joints).

While it is true that the severity of symptoms often bears little relation to the radiologic findings, Mr. Darland's disabling diagnosis has consistently been listed as degenerative disc disease and his treatment has been targeted in that way. Though conservative therapy, the use of a TENS unit, analgesic and non-steroidal anti-inflammatory medications are indicated both for DDD [degenerative disc disease] and arthritis, the use of epidermal steroid injections like those prescribed for the claimant are not used to treat arthritis of the spine. Intra- or periarticular steroid injections may produce marked symptomatic relief, but that it is not the type of steroid injection Mr. Darland received.

CONCLUSION:

Though the claimant may also have arthritis of the spine, his primary and disabling diagnosis is degenerative disc disease.

(J.A. at 320 (citation omitted).)

Dr. Shea wrote a letter on October 10, 1997 to Fortis' Clinical Service Department reiterating that Darland suffered from both "degenerative disc disease and degenerative osteoarthritis" of both the lumbosacral and cervical spine. (J.A. at 318.) By way of letter dated October 13, 1997, Fortis indicated to Darland that it had written to Dr. Shea for a clarification of what it considered to be "conflicting information." (J.A. at 319.) In a letter to Darland dated October 30, 1997, Fortis informed him that it would take the matter under advisement.

Fortis then submitted Darland's file to its Medical Director, Dr. Polly Galbraith, for further review. Dr. Galbraith agreed

with Fortis' Clinical Service Department that there was no objective evidence that Darland's alleged disabling condition was caused by arthritis. In addition, Dr. Galbraith did not find conclusive proof that Darland's alleged disability limited him from performing his job. Under Fortis' policy, "disability" or "disabled" is defined as follows:

*Disability* or *disabled* means that in a particular month, you satisfy either the Occupation Test or the Earnings Test, as described below. You may satisfy both the Occupation Test and Earnings Test, but you need only satisfy one Test to be considered *disabled*.

(J.A. at 67 (emphasis in original).) The "Occupation Test" is defined, in pertinent part, as follows;

Occupation Test

If you are a covered person in Class II:

• during a *period of disability* (including the *qualifying period*), an *injury*, sickness, or pregnancy requires that you be under the *regular care and attendance* of a doctor, and prevents you from performing at least one of the *material duties* of your regular occupation.

(J.A. at 67 (emphasis in original).) "Material duties" are defined in the following terms:

Material duties means the sets of tasks or skills required generally be [sic] employers from those engaged in a particular occupation. One material duty of your regular occupation is the ability to work for an employer on a full-time basis as defined in the policy.

(J.A. at 69.) "Full-time means working at least 30 hours per week, unless indicated otherwise in the policy." (J.A. at 66.) On the basis of the "Occupation Test," Dr. Galbraith stated that she did not find conclusive proof that Darland could not perform all the material duties of his position.

back problem extended throughout his spine and caused him severe pain, stiffness and limited movement of his neck and back. In addition, as a result of taking many strong medications for his back problem, Darland suffered from dizziness and drowsiness. Thus, Dr. Shea, found that Darland could not perform in his position as an executive vice-president due to his physical limitations and to his inability to think and concentrate as a result of the physical pain and the effect of his medication regime. Specifically, Darland could not stand for long periods of time, which was required when he attended meetings, seminars and conventions. Darland also could not sit for prolonged periods of time, which was required by his job. *See* J.A. at 526 (listing one of responsibilities of the executive vice-president position as having to attend "[m]eetings, seminars and conventions [that] involve long hours of standing[,]" and having "[c]onsiderable telephone contact with industry and agency personnel . . . [thus] requir[ing] many hours of remaining seated").

Dr. Shea's finding that Darland could not perform all the material duties of his job was confirmed by Dr. Ellen Ballard, who evaluated Darland at Fortis' request in February of 1997. In her evaluation, Dr. Ballard found that "Mr. Darland's current condition is one that would be aggravated by prolonged sitting and standing," and that "the prognosis for this patient's condition overall improving is somewhat poor." In addition, Darland underwent a "functional capabilities evaluation" requested by Fortis, which also confirmed Darland's inability to perform some of the tasks associated with his prior occupation, including his inability to stand for a prolonged duration. According to his behavioral profile, Darland was not exaggerating his symptoms. Moreover, at Fortis' insistence, Darland applied for Social Security disability benefits. After a review of his medical records, the agency determined that Darland was totally disabled, not only from performing the material duties associated with his former vocation, but from performing any gainful employment for which he is reasonably suited by virtue of his age, education and training.

## B.    Analysis

Taking into consideration Fortis' apparent conflict of interest in applying the abuse of discretion standard and the weight of the evidence considered by the district court, we conclude that the district court erred in denying Darland's motion for summary judgment seeking to recover continued LTD benefits and granting Fortis' motion for affirmation because Fortis' decision denying Darland's claim for continued LTD benefits was arbitrary and capricious.

We note at the outset that although Fortis initially denied Darland's claim for continued LTD benefits on the basis that his disabling condition did not fall within an exemption to the Special Conditions provision of the policy limiting LTD benefits to twenty-four months, Fortis has conceded that Darland's degenerative disc disease was indistinguishable from arthritis, thus constituting an exception to the Special Conditions provision. Therefore, to qualify for continued LTD benefits, Darland has to satisfy the "Occupation Test," which states that the disability "prevents you from performing at least one of the *material duties* of your regular occupation." In this case, Fortis' decision to deny continued LTD benefits to Darland was based solely upon its determination that his disabling condition did not prevent him from performing all the material duties of his position as an Executive Vice President of Market Finders.

It is clear from a review of the records of all the physicians who actually saw and evaluated Darland, principally Dr. Shea, his treating physician, that his disability prevents him from performing at least one of the "material duties" of his former occupation. As Darland points out, courts have reversed a plan administrator's decision denying disability benefits where the plan administrator ignored evidence of treating physicians supporting disability. *See Williams,* 227 F.3d at 706 (finding that the plan administrator acted arbitrarily and capriciously in failing to consider letters of attending physicians supporting the plaintiff's claim for disability benefits). According to the records of Dr. Shea, Darland's

Fortis then sent Darland a letter dated December 9, 1997, informing him that it had not changed its position that his disabling condition did not fall within the arthritis exception to the Special Conditions provision of the policy, and that his LTD benefits were thus limited to a period of twenty-four months under the policy. The letter also advised Darland of his right to appeal Fortis' decision denying him continued LTD benefits. In the letter, Fortis, after noting that Darland suffered from some other limiting medical conditions, also requested a complete list of Darland's physicians and the name of his pharmacy.

Darland responded to Fortis' request for information about his doctors and pharmacy in a handwritten letter dated January 19, 1998, formally asking for reconsideration of its decision to enforce the Special Conditions provision of the LTD policy. In addition, Darland provided Fortis with another letter written by Dr. Shea on December 8, 1997 stating, "This patient is permanently and totally disabled because of osteoarthritis throughout his cervical and lumbosacral spine. He will not return to any type of gainful employment." (J.A. at 552.) Darland also provided Fortis with a December 30, 1997 report prepared by Dr. Shea explaining his disabling condition. On January 30, 1998, Fortis wrote Darland acknowledging receipt of his request for an appeal.

Fortis then investigated the matter further. At Fortis' request, Darland was referred to Affinity Rehabilitation, Inc. of Louisville, Kentucky for a "functional capabilities evaluation." In its report about Darland's "functional capabilities," Affinity Rehabilitation stated in pertinent part:

EVALUATION RESULTS

The actual test results indicate that Mr. Darland is incapable of performing work today. In part due to his inability to do any lifting from below knee level and his decreased standing duration. I have enclosed the FCE form showing these results.

BLANKENSHIP SYSTEM BEHAVIORAL PROFILE

* * *

Mr. Darland did not exhibit Symptom Exaggeration, Inappropriate Illness Behavior and he passed 93% of his Validity Criteria giving him a Valid Validity Profile.

Therefore, the results of this evaluation are considered valid and do indicate maximal effort.

(J.A. at 527.)

In a letter dated March 7, 1998, Fortis acknowledged that Darland had provided it with records from his doctors and pharmacy, and that he had attended the functional capabilities evaluation. In the letter, the Fortis representative also stated that his file had been forwarded to its Director of Clinical Services for further review. As requested by Fortis, Dr. Shea continued to provide Fortis with disability statements. In a letter dated April 13, 1998, Dr. Shea restated that Darland's disability was based upon "osteoarthritis and degenerative disc disease." (J.A. at 147.) Upon receipt of Darland's additional medical records and the results of his functional capabilities evaluation, Fortis resubmitted Darland's file to its Medical Director and other management personnel for review and so advised Darland. Fortis then wrote to Darland on April 21, 1998, advising him of its decision to uphold its previous decision enforcing the Special Conditions provision. In pertinent part, the letter states:

The results of this review indicates that there is no documentation of an arthritis condition despite Dr. Shea's statement amending his original diagnosis from degenerative disc disease to osteoarthritis. Dr. Shea's office was contacted in regards to his records. It was confirmed that there has never been an evaluation for arthritis such as sed rate, RANA or rheumatoid factor. There appears to be no radiographic evidence of osteoarthritis nor is such demonstrated on the MRIs. Therefore, we have no documentation that would cause

who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone Tire & Rubber Co.,* 489 U.S. at 115 (quoting RESTATEMENT (SECOND) OF TRUSTS § 187, cmt d (1959)).

In this case, we believe that the district court should have considered whether Fortis was operating under an apparent conflict of interest when it denied Darland's claim for continued LTD benefits. As Darland points out, this Court in *Killian* noted, "there is an actual, readily apparent conflict here, not a mere potential for one" when the insurance company/plan administrator is the insurer that ultimately pays the benefits. *Killian*, 152 F.3d at 521. In this case, Fortis' ultimate disability determination was based upon the "peer review" panels selected by Network Medical Review Company, which Fortis had contracted to assess Darland's claim.[2] As the plan administrator, Fortis had a "clear incentive" to contract with a company whose medical experts were inclined to find in its favor that Darland was not entitled to continued LTD benefits. *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001) (noting "the conflict of interest inherent when benefit plans repeatedly hire particular physicians as experts" since "these experts have a clear incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements"). Accordingly, the existence of an apparent conflict of interest must be taken into account as a "factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co.*, 489 U.S. at 115; *Davis*, 887 F.2d at 694.

---

[2]Ultimately, Fortis relied upon the decision of the second peer review panel, which reviewed Darland's disability request after he appealed Fortis' determination denying his disability claim based upon the results of the first peer review panel.

In the case at hand, the language of the policy expressly grants Fortis discretionary authority to determine eligibility for benefits or to construe plan terms. Specifically, the section of the policy entitled "Claims Provisions" states in pertinent part:

**Authority**

We have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy.    All determinations and interpretations made by us are conclusive and binding on all parties.

(J.A. at 92.) Thus, this Court reviews the district court's grant of summary judgment to "'determine if there is any genuine issue of material fact whether the insurance company's decision to deny benefits was arbitrary and capricious.'" *Killian,* 152 F.3d at 520 (quoting *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)). Under this deferential "arbitrary and capricious" standard, this Court will uphold a benefit determination if it is "rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (internal quotations and citation omitted). Therefore, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citation omitted).

Notwithstanding this deferential standard of review, courts must be aware of a possible conflict of interest and consider it as a factor in determining whether the decision to deny benefits was arbitrary and capricious. *Id.* at 694; *see also Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1069 (6th Cir.1998) (noting that "'the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest'") (quoting *Miller,* 925 F.2d at 984). As noted by the Court in *Firestone Tire & Rubber*, "if a benefit plan gives discretion to an administrator or fiduciary

a reversal of our original determination to impose the Special Conditions Provision of your contract.

(J.A. at 162.)

In response, Darland asserted that the Special Conditions provision did not apply to him because it did not appear in the Market Finder's copy of the LTD policy until after the commencement of his disability. Fortis, however, maintained that the Special Conditions provision was added to Market Finders' policy at Darland's own request to decrease his insurance rates. Specifically, in a letter to Fortis dated April 29, 1996, Darland states "[p]lease issue our May 1, 1996 renewal per the changes we discussed in our March 15, 1996 meeting." (J.A. at 164.) Thus, Fortis denied Darland's appeal inasmuch as the Special Conditions provision was part of the Market Finders' policy at the time that Darland alleged a disability on July 17, 1996.

By a letter dated May 18, 1998, Darland again appealed Fortis' decision denying his request for continued LTD benefits, providing Fortis with additional copies of letters from Dr. Shea, as well as laboratory test data from Dr. David Newstadt, a rheumatologist involved in his care. Fortis acknowledged receipt of Darland's request to appeal its decision in a letter dated June 3, 1998.

In the meantime, Fortis requested that Darland apply for Social Security disability benefits. Thereafter, on July 8, 1998, the Social Security Administration granted Darland's application for disability benefits, finding in pertinent part that he suffered from degenerative disc disease, osteoarthritis, bone spurs, hiatal hernia, and coronary artery disease, that he was totally disabled as of July 15, 1996, and that "there are no jobs existing in significant numbers which he can perform." (J.A. at 157.)

Thereafter, in letters dated July 14, 1998 and August 12, 1998, Fortis advised Darland that it was still considering his request for continued LTD benefits under the policy. Subsequently, Fortis contacted Network Medical Review

Company to convene an independent  peer review panel to issue a report about Darland's case.  Constituting the three-member peer review panel were Dr. Robert Petrie, a Board-certified physiatrist; Dr. Saad M. Al-Shathir, a Board-certified physician of occupational medicine; and Dr. Paul Anderson, a Board-certified cardiologist.  None of these doctors personally evaluated Darland.

The peer review panel found in Fortis' favor in a report issued on September 3, 1998.  In pertinent part, Dr. Robert Petrie states:

> Mr. Darland has remained active despite the fact his back pain has reportedly been present for most of his life.  An April 15, 1996, note from Dr. Shay [sic] stated, "Has continued pain and stiffness in the back.  Stayed on Cataflam and Restoril, return in two months.  He will play golf."  The next month, on September 27, 1996, he returned to Dr. Shay [sic], and the note reported, "Has much less pain.  He is applying for SSI, two different insurance.  No surgery is indicated."  In other words, as of August 1996, he was reportedly capable of playing golf.  On September 27, 1996, he reportedly had less pain, but ironically was applying for disability benefits.  There is no indication in the record that his condition had objectively changed between August and September.

* * *

> In summary, Mr. Darland is a 55-year-old gentlemen with mild degenerative disk disease evident on neuro-imaging.  The findings are consistent with an individual of this particular age.  Such radiologic changes are not an established known cause of pain, and they have been slowly progressive over Mr. Darland's lifetime.  As recently as 1996, Mr. Darland was capable of playing golf, an activity which requires considerable flexibility and rapid movement.  There is insufficient objective evidence of Mr. Darland having a neuromuscular impairment with his reported normal reflexes, normal

> still must uphold our denial regarding our determination that you are capable of performing the material duties of your regular occupation of executive vice president, as you have the ability to perform sedentary and even aspects of light duty work.

(J.A. at 482.)  Darland thereafter filed suit.

DISCUSSION

### A.   Standard of Review

This Court reviews *de novo* a district court's grant of summary judgment in an ERISA action.  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Booker v. Brown & Williamson Tobacco, Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989).

On appeal, Darland argues that the district court erred in applying an "arbitrary and capricious," rather than a *de novo,* standard of review of Fortis' determination to discontinue payment of disability benefits to him.  In evaluating an administrator or fiduciary's interpretation of an ERISA-governed plan, the district court applies a *de novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  If the plan gives such discretionary authority, this Court reviews the administrator's decision to deny benefits using "the highly deferential arbitrary and capricious standard of review." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co.,* 489 U.S. at 115).

> As a matter of straight forward [sic] clinical fact, the symptoms generated by osteoarthritis and by degenerative disk disease are actually quite similar and do overlap to a great degree. It is quite frequently not possible, from a purely clinical perspective, to be able to separate and differentiate symptoms of degenerative disk disease from osteoarthritis of the spine. Both conditions will cause pain and stiffness in the affected areas of the spine, as well as limited range of motion. Since both conditions can cause similar or identical symptoms, there is also not a clinical differentiation that can be made between these two conditions. Such differentiation relies upon other tests such as x-rays or an MRI for instance.

(J.A. at 488.) Dr. Stadnick diagnosed the primary cause of Darland's pain symptoms from a rheumatology perspective as "degenerative spinal disease, which I am using as a combination term including both osteoarthritis of the facet joints and degenerative disk disease." (J.A. at 488.) However, Dr. Stadnick found that "Mr. Darland is capable of some time period each day of sedentary activity" and that "[c]ertainly watching the television and reading books and walking at home is more or less equivalent to using a computer, reviewing written materials and walking at work." (J.A. at 489.) Finally, Dr. Al-Shathir, after noting that "Mr. Darland's degenerative disk disease and facet arthritis present mild impairments," again concluded that "Mr. Darland's records support his ability to perform light level work, including the duties of his occupation." (J.A. at 491.)

Based upon the second peer review report, Fortis upheld its decision to deny Darland's request for continued LTD benefits beyond August 6, 1998. In a letter to Darland dated February 26, 1999, Fortis stated in pertinent part:

> While we have reached a determination that your condition would not be subject to the Special Conditions Option of the Policy, as further medical opinion indicates that in your case, it is more difficult to cite the distinction between degenerative disc disease and osteoarthritis, we

sensation, no atrophy, and no dermatomal sensory deficits or EMG changes.

(J.A. at 614.) Dr. Petrie thus concluded: "There is no reason why he could not perform his own occupation, and he possesses the ability to pursue other forms of gainful employment as well." (J.A. at 615.) Dr. Al-Shathir, who provided the physical medicine and rehabilitation assessment, stated in pertinent part:

> After a thorough review of the medical records, Mr. Darland's diagnosis is chronic low back pain from degenerative disk disease. He reports that his discomfort has gotten worse since 1966. Mr. Darland's job description is sedentary/light work and individuals with similar conditions do not have difficulty continuing this kind of employment.
>
> * * *
>
> Mr. Darland appears to exaggerate his symptoms, and has the ability to be employed full time in his previous job. He is not a surgical candidate and will not benefit from any kind of therapy, including pain management.
>
> There is no documentation in the medical records of arthritis, other than degenerative disk disease. This is a common problem in the normal population. Mr. Darland is capable of performing light work duties, if he so desires.

(J.A. at 616.) As for the cardiology assessment, Dr. Anderson noted in pertinent part that Darland "has a number of significant medical problems particularly related to degenerative arthritis and neurosensory hearing loss." (J.A. at 616.)

Based upon the findings of the peer review panel, Fortis, through its disability specialist, Ms. Brenda J. Smith, informed Darland, in a letter dated September 17, 1998, that

his request for continued LTD benefits was once again denied. In pertinent part, the letter states:

> The results of the peer reviews indicates there is insufficient objective evidence of physical impairment which would prevent you from performing your occupational activities as an Executive Vice-President. Therefore, the report supports our assessment that you are not limited from performing the material duties of your occupation.

(J.A. at 582.) The letter also acknowledges that "[t]here is no documentation in your records of arthritis of any clinical significance other than degenerative." *Id*. Applying the "Occupation Test" as defined in the policy, Fortis concluded that Darland did not suffer from a disability that prevented him "from performing at least one of the material duties of your regular occupation." *Id*.

In the September 17, 1998 letter, Fortis also informed Darland that it had overpaid him beginning on January 1, 1997 when he started to receive his Social Security disability award in the amount of $1,349.00 per month. Fortis thus requested that Darland reimburse it for the overpayment.

Darland appealed, seeking review of Fortis' decision requesting reimbursement for the overpayment and its finding that he was not prevented from performing all the material duties of his occupation. In a letter dated November 9, 1998, Darland expressed his strong disagreement with Fortis' conclusion that he did not qualify for continued LTD benefits under the policy, attaching additional "documentation which supports my disability and suggests that I not only cannot perform one task of my previous job, but in fact cannot perform the majority of them." (J.A. at 524.) On November 17, 1998, Fortis sent Darland a letter acknowledging receipt of his request for another appeal and advising him that his file would again be reviewed and evaluated. In a letter dated December 16, 1998, Fortis informed Darland that his claim was being scheduled for review "in an upcoming appeal committee hearing."

Thereafter, Fortis notified Darland in a letter on January 5, 1999 that his appeal would be heard on January 28, 1999. At the January 28, 1999 hearing, the appeal committee concluded that "additional peer review was needed" to address the issue of "osteoarthritis vs. degenerative disc disease and the main cause of pain in this particular claimant." (J.A. at 508.)

Fortis again arranged with Network Medical Review Company to establish a second peer review panel. The second peer review panel consisted of Dr. Richard Silver, who was Board-certified in orthopedic surgery; Dr. David Stadnick, Board-certified in internal medicine and rheumatology; and Dr. Saad Al-Shathir, who sat on the initial peer review panel providing the physical medicine and rehabilitation assessment. Again, none of these doctors personally evaluated Darland.

The peer review panel, once again, found in Fortis' favor. In his orthopedic assessment, Dr. Silver noted that Darland had "[o]steoarthritis of the cervical and/or lumbosacral spine," with "[r]adiographic studies indicat[ing] that his facet joints are minimally involved." Nonetheless, Dr. Silver found:

> Records support that Mr. Darland is capable of performing his usual duties as an executive vice-president, which are primarily sedentary in nature, even with frequent travel trips and conventions where he would stand for periods of time that exceeded more than an hour. In his specific activities, he should require frequent position changes so that he could sit, stand, or walk a minimum of 30 minutes, maximum of 1-1/2 hours for each. Even with these modifications, he remains capable of performing the essential functions of his job as an Executive Vice-President.

(J.A. at 486.) According to Dr. Silver, Darland "could return to his normal gainful employment and has been capable of returning to his normal gainful employment for quite some time." (J.A. at 487.) In his rheumatology assessment, Dr. Stadnick stated in pertinent part: