Barbara Susan BISHOP,
Plaintiff–Appellant,

v.

METROPOLITAN LIFE INSURANCE
COMPANY and Ingersoll–Rand Long
Term Disability Income Plan, Defen-
dants–Appellees.

No. 01–2458.

United States Court of Appeals,
Sixth Circuit.

July 10, 2003.

Before GUY, BOGGS, and DAUGHTREY, Circuit Judges.

PER CURIAM.

The plaintiff in this action, Barbara Bishop, is a former Ingersoll–Rand employee who brought suit against the company's benefits plan and its insurer, defendant Metropolitan Life Insurance Co. (MetLife), alleging that MetLife's decision to deny her claim for long-term disability benefits was arbitrary and capricious, in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). The district court granted judgment to MetLife on the administrative record, and Bishop appeals. For the reasons that follow, we affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Bishop began working for Ingersoll–Rand in 1995. As an Ingersoll–Rand employee, she participated in the company's short-term and long-term disability plans, for which MetLife acted in a fiduciary capacity as the insurer. By February 1997, Bishop had risen to a management position in the company that guaranteed an annual salary of at least $175,000. The parties agree that her professional responsibilities as director of executive leadership included "designing curriculum, contracting with providers, and meeting with management teams to identify and assess leadership talent." However, they disagree on the duties her job entailed, including whether it was sedentary, whether it required lifting, bending, carrying heavy material or other strenuous activity, and what amount of travel time and weekend work it required.

On February 7, 1997, Bishop entered a confidential agreement with Ingersoll–Rand that provided for her voluntary termination from employment with the company. The letter of agreement specified that her resignation was accepted and would be effective as of February 28, 1997. Under the terms of the agreement, the company paid her a lump sum of $115,000, agreed to provide neutral references, and agreed to pay for the cost of her health care coverage until July 31, 1997.

Three days after the letter was signed, on February 10, 1997, Bishop filed a claim for short-term disability benefits. MetLife initially denied the claim on the basis that the medical information she had provided did not substantiate her claim of total disability, but after Bishop filed a complaint with a New Jersey state agency that regulates insurance, MetLife paid her temporary disability benefits from February 10 through August 10, 1997.

When her eligibility for short-term disability benefits expired, Bishop sought long-term disability benefits. In order to qualify for long-term disability benefits under the plan, she had to satisfy the following definition of "disability":

"Disability" or "Disabled" means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:

1. You are unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education and experience (and, in the case of Executives, past earnings).

The plan also provided that the plan administrator and other plan fiduciaries "shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."

In connection with Bishop's claim, Met-Life gathered medical records and information from Bishop's treating physicians and forwarded reports from Dr. Jerome Wiater, Dr. Jean Gentry, Dr. Neil Levitt, and Dr. Kildeen Moore, as well as a report from her physical therapist, various test results and other information to the Network Medical Review, an independent panel of board-certified physicians. In a report dated March 8, 1998, the consulting Network Medical Review physicians concluded that Bishop was not totally disabled. MetLife gave Bishop an opportunity to submit additional medical information, which she did, and that information was again sent to the independent reviewers. In addition, MetLife received two reports from Investigative Visual Services, Inc., a surveillance company hired by MetLife to investigate Bishop.

Because the decision to deny benefits in this case turned principally on the facts, we summarize here the information that was presented to MetLife in regard to Bishop's claim. Medical records from Dr. Wiater, an orthopedist, showed that he found evidence of cervical radiculopathy and thoracic outlet syndrome. He stated that Bishop "cannot function for an eight-hour period because of fatigue, headaches, dizziness, and shortness of breath," and that she was "unable to perform any duties of the job she worked just prior to her last day worked because of pain in neck, shoulder, back, and right arm with numbness into right arm and right leg." Dr. Wiater filled out three physical-capacity evaluations, dated March 13, 1997, April 3, 1997,

and May 15, 1997. These evaluations indicate a progression in Bishop's impairment from being able to sit for six hours of an eight-hour day, stand for two hours, and walk for two hours, to being able to sit for 15 minutes of an eight-hour day, stand for 15 minutes, and walk for six minutes. Dr. Wiater saw Bishop three times in 1998, but provided no diagnosis and suggested that she see other physicians for their input and evaluation.

Records from Dr. Levitt, Bishop's rheumatologist, in September and October 1997 reflected his impression that Bishop had a history of cervical radiculopathy and more generalized pain and associated fatigue without other physical examination findings. X-rays of her spine were "within normal limits," with "a mild degree of C5–6, and C4–5 narrowing" in the cervical spine and "minor degenerative changes" in the lumbar spine. He suggested that "the pain is now becoming somewhat more generalized and fibromyalgia-like syndrome I think might be the most appropriate label at the present time." Dr. Levitt also filled out an "attending physician statement" and evaluation for MetLife in November 1997. In these reports, he indicated his diagnosis was for cervical radiculopathy, possible history of thoracic outlet syndrome, and fibromyalgia syndrome. The objective findings supporting this diagnosis include "multiple tender points on exam" and an "abnormal EMG 1/10/97." He indicated that her level of physical impairment was "Class 5—Severe limitation of functional capacity; incapable of minimal ('sedentary') activity," and he described her as "unable to drive, unable to work 8 hour day secondary to pain and severe fatigue . . . [and] unable to stand or sit more than 15 minute[s] at a time, unable to sustain complex thinking." Dr. Levitt also indicated that Bishop could sit, stand, and walk for one hour each out of an eight-hour day, could lift and carry up to ten

pounds occasionally, and could not use either hand for pushing and pulling or for fine manipulating.

Dr. Gentry, Bishop's internist, also filled out an evaluation form, in which she found Bishop could sit for 15 minutes in an eight-hour day, could stand for 15 minutes, and could walk for six minutes. She further indicated that Bishop could not carry or lift, use her right hand for simple grasping, or use either hand for pushing, pulling or fine manipulations.

On March 4, 1998, after reviewing Bishop's file and consulting with Dr. Wiater and Dr. Levitt, but without examining Bishop in person, the consulting physicians from Network Medical Review released their report. Dr. Mark Moyer, board-certified in internal medicine, and Dr. Robert D. Petrie, board-certified in preventative and occupational medicine, found that Bishop's records "do not support impairments of a severity to preclude work." Their report documented a conference call with Dr. Wiater in February, in which he told Drs. Moyer and Petrie that he could not comment on Bishop's condition as he had not seen her since the previous summer. The report also documented a conference call with Dr. Levitt in February, in which he told Drs. Moyer and Petrie that her physical exams were fairly unremarkable for any definitive signs or findings, that there was no active radiculopathy at the time of her last visit, that there were no ongoing symptoms of the thoracic outlet syndrome, and that her clinical picture was "mostly fibromyalgia with a lot of aches and pains, but no definitive findings." Based on a review of the medical records and the telephone conversations, Drs. Moyer and Petrie reported that Bishop could return to work with restrictions on overhead activity with the arms, heavy lifting, and pushing or pulling. They concluded that she could sit for eight hours in an eight-hour day, stand for four hours, and walk for four hours. Their report discussed the objective findings of Dr. Wiater and Dr. Levitt, ultimately concluding that Bishop did not meet the diagnostic criteria for fibromyalgia; that, even if she did, fibromyalgia rarely results in disability; and that Bishop did not have evidence that her condition was severe enough to totally preclude her employment or result in significant limitations on activities.

After this report was sent to Dr. Levitt, he filed a letter with MetLife in response, indicating that he had "no major disagreement" with the report but that he thought fibromyalgia syndrome was a "reasonably appropriate label" for Bishop even if she did not meet the diagnostic criteria. He explained that he used the label fibromyalgia syndrome "to distinguish [Bishop's condition] from more serious musculoskeletal disorders" and because he did not find evidence of anything else that would explain Bishop's "persistent symptoms." He concluded that despite his disagreement over the label of fibromyalgia syndrome, he "[agreed] with the substance of Dr. Petrie's comments."

During the course of its review of Bishop's claim, MetLife also reviewed the two reports secured from Investigative Visual Services, Inc., a surveillance company that had observed Bishop on three days. On April 17, 1998, an investigator observed Bishop drive her car from her home to the University of Michigan Medical Center, exit her vehicle, and enter the building, moving in a "normal and unrestricted fashion." Roughly an hour later, she left the building, put on a jacket, and returned to her home. On April 18, 1998, the investigator observed Bishop riding as a passenger in a car, and walking in and out of a store in a "normal and unrestricted fashion." Finally, on April 28, 1998, the investigator observed Bishop drive to the Uni-

versity of Michigan Medical Center, enter the building, exit the building an hour and a half later, drive downtown, and walk in and out of a bank, all in a "normal and unrestricted fashion."

On April 24, 1998, MetLife sent a letter to Bishop denying her claim for long-term disability benefits. The letter explained that the medical information received by MetLife and reviewed by its independent medical consultants did not support a diagnosis of cervical radiculopathy, did not demonstrate any definite presence or ongoing symptoms of thoracic outlet syndrome, and did not indicate debilitating fibromyalgia. MetLife adopted the restrictions and retained functional abilities recommended by the consulting physicians. Bishop appealed the denial and submitted as additional medical records an office note from Dr. Levitt dated April 30, 1998, in which Dr. Levitt indicated that Bishop's pain level had not improved and that she continued to feel that she was unable to work. He further stated that he did not understand how her history of cervical radiculopathy would cause her to be totally disabled, that "[h]er symptoms seem out of proportion to object exam findings," and that he had been unable to identify a specific musculosketal condition that would explain his patient's degree of disability. On November 19, 1998, MetLife affirmed its prior denial of Bishop's claim for long-term disability benefits.

In August 1999, Bishop received a notice of the award of disability benefits from the Social Security Administration, which found that Bishop became disabled according to the agency's rules on February 2, 1997. The primary diagnosis for her disability was depression, and the secondary diagnosis was cervical radiculopathy. Bishop forwarded this notice to MetLife. MetLife requested that Bishop provide copies of all the medical information sub-

mitted to the Social Security Administration. On December 29, 1999, MetLife informed Bishop that it would not review her claim and appeal again, leaving in place the earlier denial of benefits.

As a result, Bishop filed a complaint in federal court alleging that MetLife's denial of her claim for long-term disability benefits was arbitrary and capricious. By agreement of the parties, MetLife conducted another review of her disability claim and gave her the opportunity to submit additional medical information. Her entire file was submitted to a different independent physician, Dr. Robert Porter. His assessment was that Bishop had a long history of complaints of chronic pain, difficulty sleeping, cognitive problems, anxiety, headaches, fatigue, and chest pain, but that even after extensive evaluation by multiple doctors, there were no objective findings that would support significant impairments to restrict work duties. The report concluded that Bishop could perform light work duties and that "[r]eturn to work with individuals who have chronic pain complaints without serious pathology is therapeutic for their condition." The report was sent to Drs. Schultz, Levitt, and Wiater, who were asked to respond if they disagreed with the report. No response was received.

Bishop provided further medical records in July 2000, including medical reports from Dr. Frank Judge, Jr., Dr. Mark Pinsky, Dr. Marc Strickler, Dr. Seymour Baxter, and Dr. William Hampstead, as well as physical therapy reports from the Spine Program of Michigan and Wuesthoff Rehabilitative Network, x-rays, and other information. The medical records can be summarized as follows: (1) a July 1998 letter from Dr. Judge indicating that Bishop was still complaining of pain in her neck, right arm, and right shoulder that was distracting and made concentrating difficult; (2) a

series of reports from Dr. Pinsky, indicating he had examined her for her back pain, but after receiving her test results on her spine, thought her biggest concern was her anxiety/depression; (3) a psychiatric/psychological medical report from Dr. Baxter diagnosing Bishop as having "depression, chronic, probably secondary to pain; panic disorder" and "chronic pain syndrome"; (4) a report from psychologist Dr. Hampstead indicating Bishop has symptoms of depression and anxiety-related disorders; (5) an August 1998 report from Dr. Strickler discussing Bishop's symptoms and various test results and including a diagnosis of chronic right shoulder and neck pain, possible previous C6 radiculopathy, possible component of thoracic outlet, depression, some myofascial component; (6) Bishop's University of Michigan Spine Program physical therapy charts for the fall of 1999; and (7) Bishop's physical therapy charts for the spring of 2000.

MetLife provided the additional records submitted by Bishop to Dr. Porter to review. His report discussed the details of all submitted medical records. The conclusion in the report was that, although Bishop's records supported a diagnosis of chronic pain syndrome, she retained the ability to perform light duty work, and that her complaints of depression were characteristic of chronic pain. He found that she should avoid overhead/above shoulder work on the right side and repetitive abduction of the right arm. On September 6, 2000, MetLife notified Bishop that its previous decision to deny her claim was correct. MetLife concluded that

> ... [although Bishop's medical records] documented continued complaints of pain, fatigue, headaches, anxiety, difficulty sleeping and cognitive and psychological problems, clinical examinations and testing did not support that a condition of such a severity existed to prevent Ms. Bishop from a return to her job or

any gainful work or service. While her complaints may continue with a return to work, it would not cause increased injury or pathology. As such, our prior decision to deny her claim for benefits remains.

The case then proceeded in district court with the filing of cross-motions for summary judgment. After oral argument on MetLife's motion for judgment on the administrative record and Bishop's motion for summary judgment, the district court granted summary judgment to MetLife. This appeal followed.

## DISCUSSION

### A. Standard of Review

We review *de novo* the district court's grant of summary judgment. *See Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 520 (6th Cir.1998). Because the Ingersoll–Rand plan expressly grants discretionary authority to determine eligibility for benefits to the administrator and other plan fiduciaries, we review MetLife's decision to deny benefits under "the highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir.1996); *see also Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (holding that a plan administrator's denial of ERISA benefits is reviewed under the arbitrary-and-capricious standard only if the benefit plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan). Review under the arbitrary-and-capricious standard is the least demanding form of judicial review of an administrative action, requiring only an explanation based on substantial evidence that results from a deliberate

and principled reasoning process. *See Killian*, 152 F.3d at 520.

## B. MetLife's Denial of Bishop's Physical Disability Claim

 On appeal, Bishop's principal contention is that MetLife acted arbitrarily and capriciously by failing to give greater weight to the opinions of her treating physicians than to the non-treating physicians who acted as consultants in this case. At the time the appeal was heard, controlling authority in this circuit required such deference. *See Darland v. Fortis Benefit Ins. Co.*, 317 F.3d 516, 531–33 (6th Cir. 2003) (extending the "treating physician rule" developed in the social security context to ERISA cases).[1] However, the Supreme Court has recently rejected this approach in *Black & Decker Disability Plan v. Nord*, —— U.S. ——, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), holding that the "treating physician rule" has no application in ERISA cases and thus resolving the split among the circuits on this issue. It is now clear that "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Id.* at ——, 123 S.Ct. at 1967.

 In the wake of this development, we are unable to say that Met Life's denial of Bishop's long-term disability claim based on physical disability was arbitrary and capricious. We base this conclusion on the highly deferential nature of our review, the fact that Bishop's medical records did not contain objective evidence pinpointing a cause of her disability, and the hesitance of Bishop's own doctors in reaching a firm diagnosis or explanation for the cause of her subjective reports of pain.

## C. MetLife's Denial of Bishop's Mental Disability Claim

Bishop next contends that MetLife acted arbitrarily and capriciously by denying her claim for disability benefits based on her depression and anxiety/panic disorder. She relies on a diagnosis by Dr. Baxter that she was suffering from chronic depression, probably secondary to pain. Based on this diagnosis of depression, with a secondary diagnosis of cervical radiculopathy, the Social Security Administration determined Bishop was entitled to social security disability benefits.

 We conclude, however, that the district court correctly found that Dr. Baxter's report provides no support for Bishop's claim for long-term disability benefits. First, nothing in Dr. Baxter's report indicates that Bishop was in fact disabled due to depression at the time of filing her claim for long-term disability benefits. Bishop did not begin seeing Dr. Baxter until August 1998, a year after filing her claim for long-term disability benefits. Second, at the time Bishop filed for long-term disability benefits, she did not claim she was disabled due to depression. Finally, there is no evidence in Bishop's medical records that she was diagnosed with or suffering from clinical depression at the time she filed for long-term disability benefits.

## *CONCLUSION*

Because we find that the decision to deny disability benefits to the plaintiff was based on substantial evidence resulting

---

1. The Sixth Circuit joined other circuits who had already extended the rule. *See, e.g., Regula v. Delta Family–Care Disability Survivorship Plan*, 266 F.3d 1130, 1139 (9th Cir. 2001); *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir.1996); *but see Connors v. Conn.* *Gen. Life Ins. Co.*, 272 F.3d 127, 136 n. 4 (2d Cir.2001) (rejecting the treating physician rule in the context of *de novo* review of an ERISA administrator's decision); *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir.1989).

**312**

from a deliberate and principled reasoning process, we conclude that the district court's grant of summary judgment in favor of the defendants must be AFFIRMED. Given that ruling, we find no need to address MetLife's waiver argument or its motion to strike portions of the addenda to Bishop's appellate brief.