Donna C. NAPIER Plaintiff

v.

HARTFORD LIFE INSURANCE COMPANY Defendant

No. CIV.A. 02–497–KSF.

United States District Court,
E.D. Kentucky,
Lexington Division.

Sept. 17, 2003.

E. Douglas Richards, Lexington, KY, for Donna C. Napier, Plaintiff.

Joseph B. Myers, Jr., Frost Brown Todd LLC, Louisville, KY, Melissa M. Prendergast, Brenner, Brown, Golian & McCaffrey, Co., LPA, Columbus, OH, Michael E. Heffernan, Columbus, OH, Philip F. Brown, Columbus, OH, Robert L. Steinmetz, Frost Brown Todd LLC, Louisville, KY, for Hartford Life Insurance Company, Defendant.

## OPINION AND ORDER

FORESTER, Chief Judge.

This matter is before the Court upon Plaintiff Donna Napier's ("Napier") motion

for judgment overturning administrative decision, and upon Defendant Hartford Life Insurance Company's ("Hartford") cross motion for judgment on the merits. These matters are ripe for review.

## I. RELEVANT FACTUAL BACK-GROUND

Napier claims entitlement to long term disability benefits under an employee welfare benefit plan governed exclusively by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Napier was an employee of Kentucky Central Life Insurance Company, and a participant in Kentucky Central's long term disability plan. This plan was funded through an insurance policy that Kentucky Central purchased from Hartford. Hartford paid benefits to Napier from 1992 through December 31, 2001 under the aforementioned long term disability policy. In this action, Napier claims that she is disabled as a result of severe problems with her upper extremities, including bilateral thoracic outlet syndrome and bilateral cuboidal tunnel syndrome, and that Hartford, as insurer and plan administrator, wrongfully terminated her long term disability benefits. According to Hartford, it properly followed the terms of the plan and terminated Napier's benefits because she was no longer disabled.

## II. STANDARD OF REVIEW

The Supreme Court and the Sixth Circuit have held that an administrator's decision to deny benefits is to be reviewed under a *de novo* standard unless the plan provides the administrator with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." See *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801 (6th Cir.2002). However, when a grant of discretionary authority is present in the language of the benefit plan at issue, both courts have held that the administrator's determination is subject to an "arbitrary and capricious" standard of review. See *Firestone*, 489 U.S. at 107, 109 S.Ct. 948; *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590 (6th Cir.2001). Thus the standard to be applied in the instant action turns on the degree of discretion afforded the plan administrator under Napier's long term disability insurance plan.

### A. The Hartford Long Term Disability Plan

█ The pertinent language, for purposes of this Court's inquiry into whether discretion is afforded the plan administrator with respect to determining eligibility or construing terms of the plan, is as follows:

Written proof of loss must be furnished to The Hartford within 90 days after the commencement of the period for which The Hartford is liable....

The Hartford shall have the right to require as part of the proof of loss

(1) certification by you as to any Other Income benefits; and

(2) evidence satisfactory to it that you or your dependents, if applicable, have made application for all Other Income Benefits and have furnished all required proofs for such other benefits. However, you will not be required to make application for retirement benefits available only on a reduced basis. Subject to due written proof of loss, all accrued indemnity for disability will be paid monthly and any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon receipt of due written proof.

### B. Sixth Circuit Cases

The Sixth Circuit Court of Appeals has, on several recent occasions, analyzed the

language of similar insurance policies in connection with that court's query as to the amount of discretion given the plan administrator with respect to each. The analyses and conclusions in these cases inform and guide this Court.

In *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808 (6th Cir. 2002), the Court notes that the required grant of discretion to the plan administrator need not use "magic words." *Id.* In fact, all that is required is a "clear grant of discretion." *Id.* Based on language in the *Provident* policy that required written proof of loss prior to a grant of benefits, the district court applied the arbitrary and capricious standard of review. The Sixth Circuit, however, held that the district court should have instead applied the *de novo* standard. The Court stated: "the requirement that the insured submit written proof of loss, without more, does not contain 'a clear grant of discretion to determine benefits or interpret the plan.' The policies do not expressly state that the administrator has discretion over the determination of residual benefits, nor is there language requiring 'satisfactory' proof of a disability." *Id.* at 808 (citations omitted).[1]

In *Perez v. Aetna Life Ins. Co.*, 96 F.3d 813 (6th Cir.1996), even a policy requirement of "satisfactory" proof of loss was not a sufficient grant of discretion to require the use of the arbitrary and capricious standard of review. The Sixth Circuit determined, based on the policy language at issue, that a *de novo* standard of review should be applied to the plan administrator's decision. The Court noted: "[T]he Supreme Court directed lower courts to focus on the breadth of the administrator's power—their authority to 'determine eligibility for benefits or to construe the terms of the plan.' ... [S]imply because Aetna may require 'satisfactory proof' does not give the insurance company discretionary authority, either. The quoted plan provision does not specify to whom the proof should be satisfactory." *Id.* at 826 (citation omitted).[2]

While the required grant of discretion, as spelled out in the pertinent insurance policy, must be clear, the Sixth Circuit has required the use of an abuse of discretion standard in several instances. For example, in *Johnson v. Eaton Corp.*, 970 F.2d 1569 (6th Cir.1992), the Court held that an abuse of discretion standard should have been used to review the plan administrator's decision—there was a clear grant of authority in the language of the plan:

> Other courts opting for the deferential standard found significant, among other things, the type of rule-making authority granted here. The provisions regarding the administrative and rule-making authority are not the final word, however, on the Eaton committee's powers. That committee is also empowered to review

---

1. The language at issue in *Hoover* was thus:
   **Proof of Loss**
   If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss.
   **Time of Payment of Claims**
   After we receive written proof of loss, we will pay monthly all benefits then due you for disability. Benefits for any loss covered by this policy will be paid as soon as we receive proper written proof.
   **Residual Disability/Recovery benefits**
   We can require any proof which we consider necessary to determine your Current

   Monthly Income and Prior Monthly Income.
   *Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808 (6th Cir.2002).

2. The language at issue in this instance was: "[Aetna] may reasonably require ... [Aetna] shall have the right to require as part of the proof of claim satisfactory evidence ... (2) that [the claimant] has furnished all required proofs for such benefits ...." *Perez v. Aetna Life Ins. Co.*, 96 F.3d 813, 818 (6th Cir.1996).

the denial of claims, and its decision "shall constitute the final disposition under [the] Plan" of the claimant's case. Therefore, while the committee is not the first arbiter of a claimant's eligibility, the Eaton plan makes it the final one. In order to exercise this final authority, the committee members must certainly have been entrusted with the authority to exercise their judgment, or discretion, in interpreting and applying the eligibility provisions.

*Id.* at 1572. Other cases in which the policy language was sufficient to affect a clear grant of discretion include: *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir.1991)(plan stated that "disability" would be "determined on the basis of medical evidence satisfactory to the insurer"); *Bowman v. Firestone Tire & Rubber Co.,* 724 F.Supp. 493, 500 (N.D.Ohio 1989)(plan stated that "Interpretation and application of this policy to a particular circumstance shall be made by Firestone.").

### C. Appropriate Standard of Review

In sum, as per the Sixth Circuit cases discussed above, policy language requiring written proof of loss, or even "satisfactory" proof of loss is not, in and of itself, enough for a court to conclude that a grant of discretion to the plan administrator was intended. Rather, factors related to the breadth of discretion given the plan administrator should be determining.

The language in the long term disability benefits plan at issue here clearly does not amount to a grant of discretion sufficient to support the application of the arbitrary and capricious standard of review urged by the Defendant. The language the Defendant seizes upon to prove this "clear grant" is that in the policy which requires "*due* written proof of loss." However, it is evident from the context of this language that the word "due" refers only to the timeliness of the written proof—the

preceding paragraphs contain language indicating that the written proof must be "furnished within 90 days after the commencement of the period for which the Hartford is liable." Although "magic words" are not required, the grant of discretion must at least be clear. Here there is no discretion given to the plan administrator to determine whether the evidence submitted by a claimant is satisfactory, and the plan administrator is given no authority to apply or interpret the evidence submitted to determine claimant's status as disabled or claimant's ability to recover under the policy.

Thus it is this Court's conclusion that a *de novo* standard of review be applied to the Hartford plan administrator's decision to terminate Napier's long term disability benefits.

### III. APPLICATION OF THE *DE NOVO* STANDARD OF REVIEW TO HARTFORD'S TERMINATION OF BENEFITS

It is now incumbent upon the Court to determine whether Hartford acted properly when it denied benefits to Napier under the terms of the plan.

As was previously indicated herein, the Court will employ a *de novo* standard of review with respect to this matter. In *Hoover,* Judge Siler succinctly stated the *de novo* standard as follows:

> When applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits "is to determine whether the administrator ... made a correct decision." [*Perry v. Simplicity Eng'g,* 900 F.2d 963, 967 (6th Cir.1990)] The administrator's decision is accorded no deference or presumption of correctness. *See id.* at 966. The review is limited to the record before the administrator and the court must determine whether the administrator

properly interpreted the plan and whether the insured was entitled to benefits under the plan. *See id.* *Hoover, 290 F.3d at 809.* Accordingly, this Court must review the administrative record to determine whether Hartford made the "correct decision" in terminating Napier's disability benefits.

## A. Review of Administrative Record

The record reflects that over several years prior to 1992, Napier developed upper extremity overuse syndrome, including bilateral thoracic outlet syndrome, bilateral carpal tunnel syndrome, and bilateral cuboidal tunnel syndrome, exacerbated by fibromyalgia. Napier filed a claim for long term disability benefits with Hartford on September 30, 1992. Napier's occupation was listed as "Programmer/Analyst."[3] Napier's claim for benefits under the plan was approved in December of 1992. Hartford notified Napier that they would "request updated medical information periodically in order to evaluate [Napier's] continued eligibility benefits." The plan provides that, given total disability, Hartford will pay long term disability benefits at the rate of 60% of claimant's prior earnings, less "Other Income Benefits" such as Social Security Disability Benefits or Workers Compensation Benefits. "Total Disability" is defined as occurring when "you are unable, solely because of accidental bodily injury or sickness, to engage in all the material and substantial duties of your occupation."

Thereafter, and at the mandate of Hartford, Napier applied for Social Security Disability Benefits through the Social Security Administration. The Social Security Administration determined that, "[b]ased upon the claimant's residual functional capacity and vocational factors and the testimony of the vocational expert, there are no jobs existing in significant numbers in the regional economy which she can perform." Thus Napier's application was approved, and she began receiving Social Security Disability Benefits in March of 1995. Napier was also awarded disability benefits by the Department of Workers Compensation. The amount of benefits Hartford paid out to Napier was reduced in direct proportion to each of these recoveries. During the period between 1992 and 2001 Napier was seen on occasion by various medical specialists, and on a regular basis by Dr. Templin, with respect to her specific disabilities. She has undergone several surgeries in an attempt to correct various aspects of her condition and to ease her pain. At the time of her most recent examinations, she was on several different medications to reduce pain and on others to eliminate the

---

**3.** Napier's employer listed the principal responsibilities of her occupation as follows: Under general direction, formulates legal statements of business problems and devises procedures for solutions of the problems through the use of electronic data processing systems and programming. Usually competent to work at the highest level of all technical phases of system/programing while working on his own most of the time. Gives direction and guidance to lower level classifications. Confers with officials concerned to define the data processing problem. Prepares charts, tables, and diagrams to assist in analyzing problems, utilizing, if necessary, various business mathematical techniques. Devises logical procedures to solve problems by electronic data processing keeping in mind the capacity and limitations of equipment, operating time, and form of desired results. Analyzes existing system and programming logic difficulties and procedures to provide more efficient machine operations. Prepares computer block diagrams. May assist in the supervision and preparation of machine logic flow charting. Responsible for system implementation including flow charts, procedures, and documentation in accordance with established standards.

nausea induced by the pain medications. In addition, she has been participating in a home rehabilitation therapy program and has undergone a four-week "comprehensive pain management program."

Hartford referred Napier's file to its special investigations unit in August in 2001. Upon referral, Hartford ran a "Discovery Plus" search on Napier, which revealed the existence of a Dodge auto owned by Napier Dental Lab. Hartford then ran a Dunn and Bradstreet report on Napier Dental Lab, which showed the small business to employ four people, including the officers. Hartford concluded that it was reasonable to question whether Napier was working for the business, based on her background as a computer programmer. Hartford thereafter ordered a four-day surveillance of Napier. The first two days Napier was surveiled, she did not even leave her home. On the third day, Napier was videotaped as she went out to eat, shopping, and to the beauty parlor. The investigation revealed only that Napier could perform normal, everyday functions, such as buttoning her coat and pushing a shopping cart.

Based on the forgoing information, Hartford then sent Napier's records to an in-house medical consultant for review in December of 2001. Dr. Todd Lyon of Medical Advisory Group, LLC, reviewed some of Napier's medical history regarding the disabilities for which she was then recovering benefits. Dr. Lyon spoke with Dr. Charles Robert Combs, who had last treated Napier in 1994, and with Dr. James Templin, who has been Napier's attending physician for nearly 10 years. According to Dr. Lyon's report, Dr. Combs stated that he would have cleared Napier to work in 1994, and Dr. Templin stated that Napier would never be able to return to her former occupation. Dr. Lyon also considered the results from a 1997 Functional Capacity Evaluation of the upper extremities, which concluded that Napier had "limited ability to perform repetitive motion with both hands." She was also found to have "poor manipulation skills ... extremely slow hand dexterity speed." However, the Functional Capacity examiners also noted that Napier exhibited submaximal effort on grip testing. Dr. Lyon seized on this statement to find that the results of the Functional Capacity Evaluation were unreliable, and thus should not be considered. Dr. Lyon concluded that "Dr. Templin's restrictions and limitations were extreme" and that the remainder of the documentation supported Napier's "continued ability to meet the demands of her own sedentary occupation." However, Dr. Lyon did not consult with several other doctors by whom Napier had previously been treated.

Dr. Lyon submitted a report containing the above findings to Hartford on December 7, 2001, and on January 7, 2001 Hartford issued Napier a letter indicating its decision to terminate her benefits. The decision to terminate was based on Napier's medical records present in Hartford files and on Dr. Lyon's review of Napier's medical records and consultation with Dr. Templin and Dr. Combs. Napier appealed the termination of benefits, and Dr. Templin provided Hartford with a lengthy statement in which he objected to several assertions contained in the termination of benefits letter as well as to the findings of Dr. Lyon. Dr. Templin also suggested two hand specialists he felt would be qualified to provide Hartford with further information regarding Napier's condition. Subsequently, in April of 2002, Hartford arranged for Napier to undergo an independent medical examination with a Dr. Terry Trout, of Winchester, Kentucky, whose specialty is Physical Medicine and Rehabilitation. Dr. Trout performed a physical examination of Napier but did not complete any EMG nerve conduction

velocity studies. In fact, in his responses to specific questions posed by Hartford regarding the examination, Dr. Trout stated that Napier had moderate objective findings of bilateral thoracic outlet syndrome—for which conclusion he relied only on his physical examination of Napier and a 1993 EMG nerve conduction velocity study performed by another doctor. Dr. Trout concluded that Napier could return to her former occupation and could perform repetitive keyboard activities up to 2 hours at a time during an 8–hour workday, but at the same time recommended surgical intervention and psychological treatment for associated stress management of her pain and pain management techniques.

Dr. Trout's report is dated April 24, 2002, and on May 8, 2002, Hartford issued a letter in which it addressed Napier's appeal and concluded that the most recent findings with regard to Napier's condition did not preclude her from returning to work, that the decision to terminate her benefits was supported by the documentation contained in their files, and that as such, her file would remain closed. The letter cited the opinions of Dr. Trout, Dr. Lyon, and Hartford files on Napier as the basis of its conclusion, and noted that this evidence "outweighed" the opinions of Napier's treating physician, Dr. Templin.

## IV. ANALYSIS AND CONCLUSION

Based on the administrative record, as outlined above, it is clear that Hartford did not make the correct decision with respect to terminating Napier's long term disability benefits. First, the record is replete with incomplete and inconsistent findings with respect to extent and severity of Napier's conditions. Second, Napier has been adjudged "completely disabled" by the Social Security Administration, a determination not even considered by Hartford. Third, there is an inherent conflict of interest that must be considered with respect to Hartford's position in this matter.

■ Hartford's final determination in this matter was premised on inconsistent and incomplete findings regarding Napier's physical condition and ability to return to her former occupation. The opinions of Drs. Lyon and Trout were both crafted from evidence which included out-dated and unreliable sources. For instance, Dr. Lyon, a medical consultant for Hartford, decided that, based on a 2001 review of Napier's medical records, she was no longer completely disabled. One of the chief sources utilized by Dr. Lyon in reaching this conclusion was the opinion of Dr. Combs, who had not treated Napier in 7 years. Statements from Dr. Templin, Napier's treating physician, in which he indicated that Napier continued to have increased spasm and abnormalities of EMG testing and that she was unable to perform sedentary work, were discredited by Dr. Lyon because he "felt" that "Dr. Templin's opinions were based on the patient's objective complaints and reports of poor tolerance of upper extremity activity rather than on physical findings objectively documenting limitations and physical capacity." However, Dr. Lyon did not recommend any further testing to determine the extent of Napier's disability. Dr. Trout, an independent medical examiner who examined Napier in 2002, resorted to this tactic as well. In his answers to specific questions asked by Hartford, Dr. Trout stated that his conclusion that Napier's thoracic outlet syndrome was "moderate" in nature was premised on his physical exam as well as EMG studies from 1993. Furthermore, although Dr. Trout noted that his findings with respect to carpel tunnel, chest wall pain, cervical range of motion, and variance with grip testing, were inconsistent, he still recommended that Napier was able to return to her former occupation. It is

obviously not rational to make decisions as to Napier's **current** ability to perform her occupation on the basis of outdated information. Hartford at the least had a duty to base its decision regarding Napier's benefits on current data regarding her present condition. In addition, it seems odd that, when faced with inconsistent findings, Hartford did not order recent EMG testing to determine the true nature of Napier's disability.

Hartford also wrongly ignored the opinions of Napier's treating physician, Dr. Templin. Although Hartford was not required to give any special weight to the opinions of Napier's treating physician, *see Black and Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), those opinions should at least be considered in the same manner as those of physicians hired by Hartford. Throughout the administrative process, Hartford was dismissive of Templin's recommendations, stating in one letter to Napier that they were regarded as "extreme based on the objectively defined clinical status of Ms. Napier" without further explanation, and in the final appeals letter stating that Templin's opinions were simply "outweighed" by those of Dr. Lyon and Dr. Trout. As several assertions from Templin in the administrative record reveal, he did not believe that Napier's condition would improve, or that it had over the last several years. Dr. Templin was very concerned regarding Napier's health, and stated that he believed it was "medically unethical" to release her to return to work. In support of these conclusions, Dr. Templin submitted a lengthy statement detailing the treatments administered Napier, as well as suggesting that surgery might be required and recommending specialists who might examine Napier in order to give Hartford more complete information regarding her condition. Notwithstanding Dr. Templin's concerns, Hartford used the conclusions of Drs. Trout and Lyon as the basis for its decision, and noted that there would be no consideration of any further testing or examination of Napier's disabilities. It appears to this Court that the concerns of Napier's treating physician, who had been seeing her consistently for almost 10 years, should have at least been taken into account and addressed by Hartford in its decision-making process.

The weight of the evidence present in the administrative record reflects that Napier continues to be disabled under the terms of her long term disability plan. There is no objective evidence cited by Hartford to prove that she is able "to engage in all the material and substantial duties of [her] occupation," especially given that the majority of her work revolves around the ability to use keyboarding equipment constantly throughout the day. Napier's bilateral thoracic outlet syndrome and carpel tunnel complications have not been shown to have improved over the past 10 years and there is no evidence to show why or how her condition would have suddenly improved. Hartford, to terminate Napier's benefits, would have at least needed some objective findings as a result of current testing.

■ At the outset, a "Social Security Administration's disability determination is not binding on an ERISA plan administrator," *Calvert v. Firstar Finance, Inc.,* 266 F.Supp.2d 578, 585 (W.D.Ky.2003)(quoting *Coker v. Metropolitan Life Insurance Co.,* 281 F.3d 793, 798 (8th Cir.2002)). However, this Court will consider that Administration's determination of disability with respect to Napier as a factor in determining whether Hartford made the appropriate decision regarding termination of Napier's benefits in this *de novo* review. *See Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, 529 (6th Cir.2003).

The long term disability benefits policy under which Napier was covered contained an "Other Income" clause. Under this clause, the amount of a claimant's benefit under the policy is reduced by the amount of the Social Security Disability Benefit one receives. Hartford required, and indeed actively encouraged, Napier to apply for Social Security Disability Benefits. One Hartford letter noted as follows: "The Hartford has an interest in your obtaining a favorable award from the Social Security Administration since the amount awarded represents a proportionate decrease in our liability." Napier thus applied for Social Security Disability benefits and the Social security Administration approved the application upon a finding that Napier was totally disabled. 42 U.S.C. § 416(i)(A) defines Social Security Disability to mean "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." Under the Hartford policy, Napier is disabled if she is "unable . . . to engage in all the material and substantial duties of [her] occupation." Thus it is evident that the Social Security standard, which gauges a claimant's disability on said claimant's ability to perform "any" job, is much more stringent than that of Napier's policy, which gauges claimant's disability on said claimant's ability to perform in his or her own occupation. The findings of the Social Security Administration should have at least been noticed by Hartford during its decision-making process. The ALJ, in making the Social Security Disability benefits determination, reviewed an exhaustive claims file, heard from an independent vocational consultant, and concluded that Napier was disabled under a far more restrictive definition of disability than applies here. Thus the fact that Napier continues to receive Social Security Disability Benefits, her complete disability having been found continuing on subsequent evaluations, was erroneously ignored by Hartford during its decision making process regarding the termination of Napier's's long term disability benefits.[4]

Lastly, the potential impact of Hartford's conflict of interest with respect to Napier's claim on its decision to terminate her benefits guides this Court in its review of the administrative record, as " 'there is an actual, readily apparent conflict here, not a mere potential for one' when the insurance company/plan administrator is the insurer that ultimately pays for the benefits." *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527 (6th Cir.2003)(citing *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir.1998)). As is revealed by the record, the amount at stake in this matter is more than $300,000, which would have to be paid out by Hartford over the next 19 years, and Napier's claim and appeal were handled almost exclusively by Hartford employees. While a conflict of interest inquiry is most common in cases where the plan administrator's decision is being reviewed under an "arbitrary and capricious" standard, *see Darland*, 317 F.3d at 528 ("[T]he existence of an apparent conflict of interest must be taken into account as 'a factor in determining whether there is an abuse of discretion' ")(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)), this Court feels it should likewise be considered with respect to a *de novo* review.

Thus, taking into consideration Hartford's apparent conflict of interest, as well as the Social Security Administration's determination that Napier's is completely

---

**4.** This Court must assume that the Social Security Administration is fulfilling its statutory mandate to re-examine Napier once every three years to ensure the existence of a continued disability. 42 U.S.C. § 421(i).

disabled and the incomplete, inconsistent findings revealed by the record and upon which Hartford based its decision, this Court concludes that Hartford's decision to terminate Napier's's disability benefits was erroneous and that the weight of the evidence shows that Napier is still disabled under the terms of the Hartford Long Term Disability Benefits Plan.

In light of the foregoing analysis, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that:

(1) Defendant's cross motion for judgment on the merits [DE # 22] is DENIED;

(2) Plaintiff's motion for judgment overturning administrative decision [DE # 17] is GRANTED; and Plaintiff is awarded past due benefits to which she is entitled under the Hartford Long Term Disability Benefits Plan in the amount of $1,186.28/month for the months of January through October of 2002, plus $1,268.84/month for November, 2002, plus $1,351.40/month beginning December 2002. She is also entitled to pre- and post-judgment interest, and judgment will be entered contemporaneously with this opinion and order in favor of Plaintiff; and

(3) Defendant's motion to strike [DE # 30] is DENIED as MOOT.

(4) Plaintiff shall file a motion for reasonable attorney's fees incurred within ten (10) days from date of this judgment. The Defendant may then file objections within seven (7) days from the date any motion for attorney's fees is filed.

### *JUDGMENT*

In accordance with the opinion and order entered contemporaneously with this judgment, the Court HEREBY ORDERS AND ADJUDGES that:

(1) Defendant's cross motion for judgment on the merits [DE # 22] is DENIED;

(2) Plaintiff's motion for judgment overturning administrative decision [DE # 17] is GRANTED; and Plaintiff is awarded past due benefits to which she is entitled under the Hartford Long Term Disability Benefits Plan in the amount of $1,186.28/month for the months of January through October of 2002, plus $1,268.84/month for November, 2002, plus $1,351.40/month beginning December 2002. She is also entitled to pre and post judgment interest and;

(3) Plaintiff shall file a motion for reasonable attorney's fees incurred within ten (10) days from date of this judgment. The Defendant may then file objections within seven (7) days from the date any motion for attorney's fees is filed;

(4) this judgment is final and appealable and no just cause for delay exists; and .

(5) this matter is STRICKEN from the active docket.