**Mark SHERRY, Plaintiff,**

v.

**HARTFORD LIFE & ACCIDENT INSURANCE COMPANY, Defendant.**

**No. 5:01–CV–2692.**

United States District Court, N.D. Ohio, Eastern Division.

March 30, 2004.

Robert P. Rutter, Esq., Independence, OH, for Plaintiff.

Melissa M. Prendergast, Esq., Michael E. Heffernan, Esq., Phillip F. Brown, Esq., Brenner, Brown, Golian & McCaffrey, Columbus, OH, for Defendant.

*MEMORANDUM OF OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND DENYING DEFENDANT'S MOTION FOR JUDGMENT*

WELLS, District Judge.

Before this Court are plaintiff Mark Sherry and defendant Hartford Life & Accident Insurance Company's ("Hartford") cross-motions for judgment on the merits of plaintiff's ERISA claim. (Docket #25 and #29). Defendant also filed a memorandum in opposition to plaintiff's motion for judgment. (Docket #31).

For the reasons set forth below, plaintiff's motion is granted and defendant's motion is denied.

## I. BACKGROUND

### A. The Parties and Mr. Sherry's occupation

In 1992, plaintiff Mark Sherry began working as a sales representative for West Group ("West").[1] (Compl. at ¶9). By virtue of his employment at West, Mr. Sherry participated in a group long-term disability insurance plan ("the Plan") offered by West Group for the benefit of its employees. (Compl. at ¶7). The Plan offers disability benefits through a policy of insurance ("the Hartford Policy") purchased by West Group from defendant Hartford. (Compl. at ¶7; Group Policy GLT–043051, Record at 1–64). The Hartford Policy provides "income protection if you become disabled from a covered accidental bodily injury, sickness, or pregnancy." (Record at 33). Under the Policy, Hartford "reserves the right to determine if your proof of loss is satisfactory" and claimants are required to submit proof of loss satisfactory to Hartford to be entitled to benefits. (Record at 29, 48, and 53).

As a sales representative for West, Mr. Sherry was responsible for, among other things, selling West's products and maintaining its customer accounts within an particular territory. (Record at 119). Among the working conditions described in West's job description are "[o]ffice and outside sales environment," "[f]requent ov-

---

**1.** West Group is a provider of research products and services to the U.S. legal market.

(Record at 0322).

ernight travel," and "daily carrying up to 40 lbs." (Record at 119, 323–24). Peter Sherman, West's Regional Sales Manager, further illuminated the physical requirements of Mr. Sherry's job:

- The person must be able to carry a roughly 40 lbs. sales bag "for as long as 2–3 hours between demonstrations as s/he is canvassing for appointments."
- The person must be a "warrior" with the "stamina to drive as far as five hours to get to a customer and then be fresh," with the ability to "walk several miles during the day while carrying the sales bag, and then be fresh," and with the capacity to "sit for several hours on end, and then be fresh enough to carry on to the next customer."

(Record at 281–82). At Hartford's request, West's Human Resources Department completed three Physical Demands Analysis ("PDA") forms which classified Mr. Sherry's position as medium work requiring "lifting 50 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 25 lbs." (Record at 121–23, 270–72, and 317–19). In two of the forms, it was noted that Mr. Sherry always carries a briefcase, laptop computer, and sales data. (Record at 272 and 319). On 8 January 2001, Hartford spoke with Gretchen Domeier in West's Human Resources Department in an apparent attempt to clarify information on the PDA forms. (Record at 86). According to Hartford's records, Ms. Domeier explained that:

sales reps have a laptop that weights approx. 12 lbs. They have samples that can weigh up to about 5 lbs. apiece and these things can be lifted one at a time but they do not have to be all lifted together and the sales people can use carts and things w/ wheels so they don't have to carry samples or their briefcases which fully loaded should not weigh more than 20, maybe 25 lbs.

(Record at 86). In March 2001, Levon Knowles, from West's Human Resources Department, sent a letter to Hartford regarding the physical requirements of Mr. Sherry's job which explained, in pertinent part:

The amount of weight that a Sales Rep is required to carry will very [sic] depending on what client group they are selling to and what part of the country they are working in... Based on what I know of the position, I don't see why the Sales Rep could not use some sort of cart. However I am not certain of how much that would aid the Sales Rep as they often need to navigate stairs upon entering and exiting our clients and to my experience, pull carts can be just as difficult in those situations.

(Record at 316). Mr. Sherry likewise explained that, in his own experience, a cart was of little utility as he still needed to lift 40 pounds or more and his job still required similar levels of physical exertion. (Record at 279).[2]

---

2. In a letter to Hartford, Mr. Sherry explained:

You should also note that before I went on disability that I had tried to use a cart several times and found it to be even worse. If you take into consideration the diagnosis of my back pain you would find that the additional bending and twisting I would do, taking things off and on the cart, would result in a greater degree of pain (the disks rubbing against one another). You should also note that while using a cart your body has to lean to one side or the other to pull the cart, which again results in the rubbing of the disks. Another problem I found with a cart was unavailability of an elevator in the buildings. I had found on a daily basis, buildings with no elevators in them, and had to carry the entire cart up the stairs (weighing 40 plus pounds), which resulted in severe pain, and most often had to end my day, due to the severity of the pain. (Record at 279).

## B. Mr. Sherry's Alleged Disability

At the time of his disability claim, Mr. Sherry was a 38 year-old sales representative who has experienced chronic low back pain for 20 years. (Record at 253 and 208). In August 1999, Mr. Sherry sustained an injury to his back while pulling a computer out of his car. (Record at 115). Initially, Mr. Sherry was treated by Dr. David George, who completed a statement of disability diagnosing Mr. Sherry's injury as a lumbosacral sprain causing lower back, hip, and leg pain and restricting his range of motion. (Record 148). In his report, Dr. George opined that Mr. Sherry could not stand, walk, sit, or drive for more than one to two hours and that he could not bend, lift, carry, or reach overhead. (Record 149). On 4 October 1999, Mr. Sherry began treatment with Dr. Bina Mehta, of the Western Reserve Spine and Pain Institute, whose initial impression was that Mr. Sherry's chronic low back pain was "likely due to lumbar radiculopathy, specifically at L4 with degenerative disc disease." (Record at 209). On 4 October and 25 October 1999, Dr. Mehta issued disability certificates indicating that Mr. Sherry could not return to work, at least for a period of time. (Record at 139 and 142). After reviewing Mr. Sherry's MRI, Dr. Mehta concluded that Mr. Sherry had spinal stenosis with multilevel disc bulges as well as a disc extrusion at L4–5 and needs to undergo lumbar epidural injections. (Record at 139).[3]

Dr. Mehta scheduled Mr. Sherry for a surgical consult with Dr. Jeffrey Tharp on 10 February 2000. After a physical examination of Mr. Sherry and an evaluation of his MRI, Dr. Tharp's impression was "multi-level degenerative disc disease, spondylosis causing mechanical back pain." (Record at 248). Rather than surgery, Dr. Tharp recommended "continued management with physical therapy, anti-inflammatories medication, bracing, and aggressive exercise." (Record at 248). On 24 February 2000, after having seen Mr. Sherry 25 times, Dr. Mehta completed an attending physician's statement of disability indicating that Mr. Sherry could only drive 30 minutes at a time, that standing and walking should be limited to 20 minutes at a time, and that sitting should be limited to 15 minute intervals. (Record at 171). In addition, Dr. Mehta indicated that Mr. Sherry had 10 lbs. carrying limit, a 20 lbs. lifting limit, a 40 lbs. pulling limit, and a 60 lbs. pushing limit. (Record at 171).[4]

On 27 July 2000, after reviewing Mr. Sherry's medical records, speaking with Dr. Mehta, and watching a surveillance

---

3. Specifically, an MRI of Mr. Sherry's lumbosacral spine indicated the following impression:

Spinal stenosis at L3–L4 and to a lesser extent at L4–L5 that is a combination of congenital changes and mild bulges of the disc. Probably the most significant abnormality is the soft tissue density in the left recess and the left neural foramina at L4–L5 that is either inflammatory in origin or possibly representing disc material. Scarring could give this same appearance but there is no definite history of previous surgery.

(Record at 140).

4. On 28 April 2000, Dr. Benson, another physician treating Mr. Sherry, completed a Physical Capabilities Evaluation Form, stating that Mr. Sherry could frequently lift up to ten pounds, but could never lift over twenty pounds. (Record at 203). Dr. Benson concluded that Mr. Sherry was only capable of sedentary work which was defined as:

Lifting 10 lbs. maximum and occasionally lifting and/or carrying such articles as dockets, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.

(Record at 204).

tape of Mr. Sherry,[5] Dr. Todd Lyon, Hartford's Associate Medical Director, concluded that Mr. Sherry's degenerative disk disease prevents him from lifting over 20 lbs. as such activity is likely to further damage his lumbar spine and therefore precludes him from performing medium work. (Record at 253). In addition, Dr. Todd determined that, though Mr. Sherry could perform 8 hours of light work a day, he lacked the "capacity to perform his own occupation which requires up to 50 pounds of lifting occasionally." (Record at 253).

On 3 May 2001, Dr. Brian Mercer spoke with Dr. Mehta about Mr. Sherry's diagnosis and his current physical limitations. (Record at 301–302). According to Dr. Mercer, Dr. Mehta related Mr. Sherry's work restrictions as follows:

Mr. Sherry can sit for six hours out of eight hours, performing this one hour maximally at a time, stand for six hours out of eight hours performing this maximally 45 minute at a time, walk seven out of eight hours, performing this one hour at a time, and drive six out of eight hours, performing this maximally one hour at a time. [H]e can stoop up to one-third of the day (occasionally), perform balancing activities without restriction, do occasional kneeling and crawling, and lift up to 25 pounds. [He has] no restrictions on his handling and fingering activities. He may use a cart to

assist him with his occupation without restriction.

\* \* \* \* \* \*

[Mr. Sherry's] work restrictions [are] likely to be permanent.

(Record at 301).[6]

## C. Relevant Plan Provisions

The Hartford Policy issued to West Group for the benefit of West's employees offers long-term disability benefits in the form of income protection if an employee becomes "disabled from a covered accidental bodily injury, sickness, or pregnancy." (Record at 33). Disabled is defined to mean "either Totally or Residually Disabled, or Total or Residual Disability." (Record at 35). Under the Plan, Total Disability or Totally Disabled means that:

(1) during the Elimination Period;[7] and,

(2) for the next 24 months, you are prevented by:

(a) accidental bodily injury;

(b) bodily injury;

(c) mental illness;

(d) substance abuse; or

(e) pregnancy,

from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment

---

5. Consisting of 42 minutes of footage, the surveillance tape shows Mr. Sherry washing his car, carrying a bucket of water, carrying a small bag, and screwing a small satellite dish on the side of his house. According to Dr. Todd, the surveillance video supports the conclusion that Mr. Sherry could meet the physical demands of light work but offers no evidence to suggest that Mr. Sherry could engage in medium work or lift anything that approached or exceeded 50 pounds. (Record at 252).

6. After independently reviewing Mr. Sherry's medical records, Dr. Mercer essentially con-

curred with the limitations as set out by Dr. Mehta. (Record at 337).

7. The Elimination Period is the period of time a plan participant must be disabled before benefits become payable. (Record at 34). It is the last to be satisfied of the following:

(1) the first 26 consecutive weeks of any one period of Disability; or,

(2) with the exception of benefits required by state law, the expiration of any Employer sponsored short-term disability benefits or salary continuation program.

(Record at 34).

approved by us. After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience.

(Record at 39–40). In other words, during the first two years of benefit eligibility, an individual must be totally disabled from his or her "own occupation." After that two-year period, benefits will only continue if the individual cannot perform the duties of any reasonable occupation for which he or she is qualified.

## D. Procedural Background

After sustaining the injury to his back on 30 August 1999, Mr. Sherry did not return to work with West. Initially, Mr. Sherry submitted a telephonic claim for short-term disability benefits because of a "hurt back" sustained while "pulling computer out of car." (Record at 115). Hartford denied short-term disability ("STD") benefits because injuries "arising out of or in the course of any occupation or employment" are expressly excluded from coverage under West's short-term disability plan. (Record at 116). On 25 February 2000, at the end of the 26–week Elimination Period, Mr. Sherry next filed a claim for long-term disability ("LTD") benefits with Hartford. (Record at 165–172). At first, Hartford allowed Mr. Sherry's claim for LTD benefits, effective 29 February 2000, and paid Mr. Sherry his maximum monthly benefit of $5,943.68.[8] (Record at 195–97). After paying Mr. Sherry LTD benefits for approximately 10 months, Hartford, on 17 January 2001, informed Mr. Sherry that it had determined that "the evidence submitted in support of [his]

claim does not establish that [he was] Totally Disabled as defined by the group policy."[9] (Record at 261). In its letter denying Mr. Sherry's claim for continuing LTD benefits, Hartford articulated the following reasoning:

Part of the decision in approving your claim for Long Term Disability benefits involved the fact that you were unable to lift a maximum of approximately 50 pounds as was originally indicated to us by your employer as a physical requirement of your job. We now have clarification from your employer that your job does not require you to lift 50 pounds. They have informed us that your job involves lifting a maximum of approximately 20 pounds.[10]

Based on the new evidence provided by your employer, your own occupation is classified as light duty. The medical evidence in your file documents that you are capable of full-time light duty work, therefore, since your restrictions are within the limits of your own occupation, you do not meet the definition of Totally Disabled and your claim for benefits has been denied.

(Record at 267–68). Disagreeing with Hartford's characterization of the sales representative position as light duty work, Mr. Sherry mailed and faxed, on 15 February 2001, an appeal letter to Hartford disputing the utility of the cart and the amount of weight he was required to carry and attaching West's written job description which stated that the duties include "daily carrying up to 40 lbs." (Record at 278–80).

On 16 February 2001, Hartford called Ms. Domeier at West to obtain a verifica-

---

**8.** Mr. Sherry's maximum monthly benefit is calculated based on 70% of his basic monthly income (three-year average on W–2 forms) of $8490.97. (Record at 197).

**9.** Hartford paid Mr. Sherry benefits through 31 December 2000. (Record at 269).

**10.** This new evidence is apparently based on Hartford's conversation with Gretchen Domeier on 8 January 2001.

tion of the job description. (Record at 84). After receiving verification that Mr. Sherry's job required lifting up to 40 pounds, Hartford sent its third and final PDA form to West; the form, filled out by Ms. Domeier, again described Mr. Sherry's job as medium duty work. (Record 317–19). On 7 March 2001, Hartford again called Ms. Domeier, requesting information on whether sales representatives could use carts and the maximum amount they must lift. (Record at 82). Responding to Ms. Domeier's suggestion, Hartford next contacted Mr. Knowles for that information. (Record at 82). As previously noted, Mr. Knowles replied by letter stating that the amount of weight a sales representative must carry varies and that "pull carts can be just as difficult" in many situations as carrying all the necessary sales materials and products. (Record at 316). On 29 May 2001, Hartford denied Mr. Sherry's appeal and upheld its previous decision that Mr. Sherry was not entitled to LTD benefits because he was "capable of performing [his] specific job with West Group as well as the occupation of Sales Representative in the general economy." (Record at 325–28).

After a series of requests that Hartford reconsider its decision, which Hartford denied, Mr. Sherry filed this lawsuit setting forth claims for benefits under ERISA, breach of fiduciary duty, breach of ERISA regulations, and bad faith. (Compl. Counts One through Four). As this Court subsequently dismissed Mr. Sherry's breach of fiduciary duty, breach of ERISA regulations, and bad faith claims, the only remaining claim is Mr. Sherry's claim for benefits under ERISA. (Docket # 23 and # 24)

## II. ERISA STANDARD OF REVIEW

■ This case involves a claim for total disability benefits under an ERISA-governed employee benefit plan. In assessing a benefits determination under ERISA, courts must first decide which of ERISA's two standards of review applies, arbitrary and capricious or *de novo*. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Under *Firestone*, courts only utilize an arbitrary and capricious standard of review if the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe terms of the plan. *Id.; Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 613 (1998). In this case, both parties agree that the benefit plan gives discretion to Hartford to determine if a claimant's proof of loss is satisfactory and thus that the arbitrary and capricious standard applies. (Docket # 25, at 16; Docket # 29, at 9).

■ Under this deferential "arbitrary and capricious" standard, a benefit determination will be upheld so long as it is "rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996). If it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious. *University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F.3d 839, 846 (6th Cir.2000). This deferential review of a benefit denial is tempered by the following two principles: 1) potential conflicts of interest must be taken into account; and 2) plan language susceptible to more than one interpretation is construed against the plan administrator.[11]

11. In an unpublished decision, another Sixth Circuit panel questioned the *University Hospitals* statement that ambiguous plan language should be construed against the plan administrator as well as its impact on the arbitrary and capricious standard. *Mitchell v. Dialysis Clinic, Inc.*, 18 Fed.Appx. 349, 353–55, 2001 WL 1006291, at *3–4 (6th Cir.2001). In *Mitchell*, however, the Court explicitly chose

*Id.* at 846–47. A conflict of interest exists where the plan administrator is appointed and/or controlled by the entity funding the plan or where the plan administrator and the insurer that ultimately pays the benefits are the same entity. *Id.* at 846; *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 527–28 (6th Cir.2003) (noting that " 'there is an actual, readily apparent conflict not a mere potential for one' when the insurance company/plan administrator is the insurer that ultimately pays the benefits."); *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998). If the plan administrator is operating under a conflict of interest, this conflict must weighed as a factor in determining whether "the decision to deny benefits was arbitrary and capricious." *Darland*, 317 F.3d at 527; *See also Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948. Because Hartford is both the plan administrator deciding eligibility and the insurance company ultimately responsible for paying the claim, there is "an actual, readily apparent conflict" which must be considered in the course of reviewing Hartford's benefits determination. *Darland*, 317 F.3d at 527–28; *Killian*, 152 F.3d at 521.[12]

## III.  ANALYSIS

### A.  ERISA Claim

In Mr. Sherry's ERISA claim for LTD benefits, he argues that he is entitled to coverage for the full 24 months allowed by the Plan for "own occupation" total disability. Both the parties and the medical experts in this case agree that Mr. Sherry can perform light work, but not medium work. (Docket # 25 at 11, and # 29, at 1). Based on the medical evidence in the record, including the opinion of Hartford's own associate medical director, it is undisputed that, given his disability, Mr. Sherry cannot lift over 20 pounds, cannot drive, sit, stand, or walk for more than an hour without rest, and cannot perform medium work which requires "lifting 50 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 25 lbs." However, as Mr. Sherry admits, the medical evidence also suggests that he can perform light work involving "lifting 20 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 10 lbs."

As Hartford based its decision to deny Mr. Sherry LTD benefits on its determination that his job as a sales representative for West constituted light work, the sole

not to resolve those issues as it concluded instead "there are two bases on which the Plan administrator relied in denying coverage and there is no ambiguity as to one." *Id.* at 354, 2001 WL 1006291 at *4. Thus, *University Hospitals'* rule of interpretation remains good law.

**12.** Citing an unpublished Sixth Circuit opinion, *Wages v. Sandler O'Neill & Partners, L.P.*, Hartford suggests that a conflict of interest exists only where the plaintiff points to significant evidence in the record that the insurer was actually motivated by self-interest. 37 Fed.Appx. 108, 111–12, 2002 WL 339221, at *3 (6th Cir.2002). (Docket # 31, at 1–2). In its very brief discussion of the issue of conflicts, the Court, in *Wages,* cites to two Seventh Circuit cases rather than the other Sixth Circuit cases dealing with conflict of interests.

As demonstrated by *Killian, University Hospitals,* and *Darland,* the onerous and particularized requirement suggested by Hartford for establishing a conflict of interest does not exist; rather, the primary determination of whether a conflict of interest exists turns on the relative roles and relationships of the parties involved. The Sixth Circuit has also made clear, notwithstanding Hartford's arguments to the contrary, that arranging for the independent review of an individual's claims does not automatically obviate apparent conflicts of interest. *Darland,* 317 F.3d at 527; *Killian,* 152 F.3d at 521. This is especially true where, as here, the essential diagnosis and limitations of Mr. Sherry's disability are not significantly in dispute and the benefit determination was based primarily on Hartford's assessment of the physical requirements of Mr. Sherry's job.

remaining question in dispute is whether Hartford's classification of Mr. Sherry's job was arbitrary and capricious. The overwhelming evidence in the record, including Mr. Sherry's testimony of his job responsibilities, three PDA forms filled out by West's Human Resources Department, West's official job description for Mr. Sherry's position, and Peter Sherman's, West's Regional Sales Manager, and Levon Knowles' description of the position, evince the following physical requirements for Mr. Sherry's sales representative position:

- While the weight that a sales manager must carry and lift on a daily basis may vary, he or she must be capable of lifting a maximum of 50 pounds and regularly lifting and carrying a 40 pound sales bag.
- The sales representative must have the capacity to sit for several hours, walk several miles, and drive as far as five hours to get to a customer.
- While sales representatives may be able to use carts, the use of carts does not necessarily minimize the physical requirements of the job.

These physical requirements of Mr. Sherry's job fall within the definition of medium work, as noted by West's Human Resources Department in three separate PDA forms, and exceed his well-documented and undisputed physical limitations, especially his inability to lift over 20 pounds and drive more than an hour at a time.

Based on an initial PDA form obtained from West's Human Resources Department and a statement from Mr. Sherry describing his duties, Hartford initially agreed that Mr. Sherry's job constituted medium work and that his physical limitations prevented him from working as a sales representative for West. Subsequently, based on a single conversation with Gretchen Domeier from West's Human Resources Department, Hartford determined that Mr. Sherry's occupation was more properly classified as "light duty." (Record at 267). During this conversation, Ms. Domeier allegedly told Hartford that "sales people can use carts and things w/ wheels so they don't have to carry samples or their briefcases which fully loaded should not weigh more than 20, maybe 25 lbs." (Record at 86). Hartford latched onto this comment, ignored all the evidence to contrary, and denied Mr. Sherry further LTD benefits.

■ Hartford's determination that Mr. Sherry's job was light duty is arbitrary and capricious as it unreasonably ignored prodigious evidence to the contrary. Both before and after Ms. Domeier's alleged comments that West's sales representatives can use carts and need not lift more than 20–25 lbs, Ms. Domeier completed PDA forms classifying Mr. Sherry's job as medium work requiring lifting up to 50 pounds.[13] In their attempts to clarify this apparent contradiction, Hartford obtained verification of West's job description which listed the ability to lift up to 40 pounds as a requirement of the sales representative position and turned to Levon Knowles, as directed by Ms. Domeier, who explained that the amount of weight a sales repre-

---

**13.** While Hartford has interpreted Ms. Domeier's comments to mean that West's sales representatives need not lift over 20–25 pounds, her intended meaning is actually somewhat vague. Though Ms. Domeier apparently said that the sales representatives' briefcases (or depending on how you read the statement, a fully loaded cart) should not weigh more than 20–25 pounds, she did not specifically articulate the maximum amount of weight a sales representative is expected to lift in the course of his employment. As she filled out two forms stating that the maximum weight Mr. Sherry needed to be able to lift as a sales representative was 50 pounds, it is actually more reasonable to assume that the 20–25 pounds she referred to did not indicate a maximum.

sentative must carry varies and that, in his experience, carts are not very helpful. In the meantime, Mr. Sherry also explained how his attempts to use a cart did not alleviate the pain and actually aggravated the situation and submitted a job description by West's Regional Sales Manager, Peter Sherman. Mr. Sherman's description of the job is most instructive as it specifically outlines the rigorous physical requirements of a sales representative's job—lifting a 40 pound sales bag for two to three hours between demonstrations, driving as far as five hours to visit customers, walking several miles in a given day, and sitting several hours on end. (Record at 281–82). In classifying Mr. Sherry's job as light work, Hartford did not simply exercise its discretion in resolving conflicting descriptions of the physical requirements of Mr. Sherry's job, but rather unreasonably relied on and possibly misconstrued a single conversation to define the requirements of the job while discarding West's own job description, its Human Resource Department's three PDA forms, and its Regional Sales Manager's description of the position. Accordingly, its classification was unreasonable and its decision to deny Mr. Sherry benefits was arbitrary and capricious.[14]

■ Hartford's conflict of interest and its failure to address Mr. Sherry's other limitations bolster this Court's conclusion that Hartford's denial of benefits was arbitrary and capricious. Hartford's dual role as plan administrator determining eligibility for benefits and insurer paying out benefits to those deemed eligible is not only relevant to the determination that its benefits decision was unreasonable but also illuminates a possible motivation behind its irrational decision-making. Moreover, Hartford's failure to adequately address all of Mr. Sherry's limitations further undermines the reasonableness of its decision. Given that Hartford does not reconcile Mr. Sherry's driving, sitting, and walking limitations with the lengthy driving, sitting, and walking requirements of his job, its decision to deny benefits to Mr. Sherry is not a reasoned one.

## B. Damages

Having determined that Mr. Sherry is entitled to LTD benefits wrongfully withheld from him, the Court must now calculate Mr. Sherry's damages. As Hartford has already paid Mr. Sherry for ten months of LTD benefits, at $5,943.68 per month, Mr. Sherry is entitled to payments for the remaining fourteen months, amounting to a total of $83,211.52.

---

**14.** In its briefs, Hartford offers another basis to justify its denial of Mr. Sherry's claims that stretches credulity. It argues that the Plan's definition of total disability requiring that the employee be incapable of "performing the essential duties of your occupation" refers to the employee's occupation generically and not the specific job he has with his employer. (Record at 40). Notwithstanding its almost exclusive focus on the specific responsibilities of Mr. Sherry's job at West while processing his claim (Hartford did not even make passing reference to the general sales representative occupation until its denial of Mr. Sherry's appeal), Hartford now suggests that it was reasonable for Hartford to interpret "occupation" to mean a generic sales representative for publications in the economy at large and as described in the Dictionary of Occupational Titles. Based on this interpretation of the Plan, Hartford contends that Mr. Sherry should be denied benefits because his generic "occupation" is defined as light work. (Docket # 31, at 4; Record at 329). Not only is this assertion disingenuous given that it denied Mr. Sherry's benefits "based on the new evidence provided by [his] employer," it is also an unreasonable interpretation of the Plan's language. Moreover, even if the language were susceptible to more than one interpretation, it should be construed against Hartford and in Mr. Sherry's favor. *University Hospitals*, 202 F.3d at 846–47.

■ Mr. Sherry also seeks prejudgment interest. Although ERISA does not mandate the award of prejudgment interest to prevailing plan participants, district courts have the discretion to award prejudgment interest in accordance with general equitable principles. *Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576, 585 (6th Cir. 2002) (citing *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir.1998)). An award of prejudgment interest serves to compensate the beneficiary for the lost interest value of money wrongly withheld from him or her. *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 810 (6th Cir.2002). Given the public policy behind ERISA, participants of ERISA benefit plans generally have a right to prejudgment interest when the plan administrator wrongfully withholds benefits. *Wells v. United States Steel, Carnegie Pension Fund*, 76 F.3d 731, 737 (6th Cir. 1996).

■ In calculating prejudgment interest, the Sixth Circuit has approved a blended rate of interest established by 28 U.S.C. § 1961, which averages the 52–week United States Treasury Bill interest rate, over the relevant time period and has also upheld a formula which would award the higher of the Section 1961 rate or the rate actually realized by Hartford on the relevant funds. *Id.; Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 986 (6th Cir.2000). This Court adopts that latter formula as it is an appropriate mechanism for avoiding unjust enrichment. *Rybarczyk*, 235 F.3d at 986. Moreover, the Sixth Circuit has endorsed, and this Court adopts, a stream of benefits model which calculates the interest due on each monthly payment of disability benefits beginning with the date that each payment was due. *Id.* Prejudgment interest in this case shall be based on a stream of benefits model using the higher of the Section 1961 rate or the rate actually realized by Hartford on the relevant funds.

■ With respect to attorney's fees, this Court has broad discretion pursuant to 29 U.S.C. § 1132(g). *Hoover*, 290 F.3d at 809. In exercising its discretion, however, the Court must consider the following five factors: 1) the degree of the opposing party's culpability or bad faith; 2) the opposing party's ability to satisfy an award of attorney's fees; 3) the deterrent effect of an award on other persons under similar circumstances; 4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and 5) the relative merits of the parties' positions. *Id.* To properly exercise its discretion, this Court requires additional briefing by the parties as discussed below.

## IV. CONCLUSION

For the reasons set forth above, plaintiff Mark Sherry's motion for judgment on his ERISA claim is granted and defendant Hartford's motion is denied. Hartford shall pay to Mark Sherry $83,211.52 in long-term disability benefits as well as prejudgment interest. To aid in the calculation of prejudgment interest, the parties shall follow the following procedure:

- On or before 9 April 2004, Hartford shall file a brief setting out both the Section 1961 interest rate and the interest rate actually realized by Hartford on the relevant funds and then utilize the higher interest rate to calculate the prejudgment interest on each monthly payment due.

- Mr. Sherry may, but need not, file a response, on or before 16 April 2004, if he objects to any of Hartford's calculations.

With respect to attorney's fees and/or costs, this Court will base its discretionary decision to award such fees and costs on

the administrative record and on the following:

- On or before 16 April 2004, plaintiff shall filed a detailed request for attorney's fees and/or costs with specific, supporting documentation as well as a brief addressing the five *Hoover* factors set forth above.
- Defendant may file a response and plaintiff a reply according to the schedule established by Local Rule 7.1 for non-dispositive motions.

IT IS SO ORDERED.

## JUDGMENT ENTRY

The Court has contemporaneously entered its memorandum of opinion and order granting plaintiff Mark Sherry's motion for judgment and denying defendant Hartford Life & Accident Insurance Company's ("Hartford") motion for judgment. It is, therefore, ordered, adjudged, and decreed that Hartford shall pay to Mr. Sherry $83,211.52 along with prejudgment interest, fees and costs to be determined.

IT IS SO ORDERED.